TENNANT, Adm'r, etc., v. TRAVELLERS' INS. CO.

(*Circuit Court, N. D. California.* April 18, 1887.)

1. INSURANCE—RENEWAL OF POLICY—CONDITION—WAIVER.
An insurance company was in the custom of sending to its agents renewal receipts signed in blank, with authority to countersign and deliver them as they were required. The policy contained a clause making the actual payment of the premium a condition precedent to its binding force, and providing that no waiver should be claimed by reason of anything done by any agent, unless specially authorized in writing. The custom of the agents was to give credit on the premiums, and the company, with knowledge of the facts, received and retained the premiums paid at the expiration of such credits. *Held*, that the delivery of the renewal receipts to the insured continued the policy in force from year to year.

2. SAME—DELIVERY OF RENEWAL RECEIPT.
Before the expiration of the previous renewal, the agent of the company, under the direction of the insured, filled out and countersigned a receipt purporting to renew the policy for another year, and also, at the request of the insured, retained the receipt in his office, where it remained to the time of the death of the insured. *Held*, that there was a delivery of the renewal receipt which continued the policy in force.

3. SAME—ACCIDENT INSURANCE—CAUSE OF DEATH—EVIDENCE.
Deceased, who was subject to epileptic fits, was found dead in a plunge-bath in an almost standing position, the water having a temperature of about 100 deg. There was an abrasion between his eyes, and a bruise on one side of his head. His physician testified that the entrance into the bath of one in his then condition would be likely to result in an epileptic attack, and that the fall or blow which caused the abrasion or bruise were not sufficient to have caused death. *Held*, upon the evidence, that the deceased came to his death through other causes "than external, violent, and accidental means, within the intent and meaning" of the policy in suit.

Ross, J. This action is brought by the administrator of the estate of William Tennant, deceased, to recover the amount of a policy of insurance issued by the Travellers' Insurance Company of Hartford, Connecticut, to the said William Tennant, on the twentieth day of June, 1881.

For the defendant it is contended that the policy, as originally issued, was void by reason of certain alleged false statements contained in the application upon which it was based. I do not think the evidence shows that there was any misrepresentation of fact in the application, and the finding will therefore be against the defendant on that issue. But the defendant resists the action on two other grounds,—one being that, conceding the validity of the policy as originally issued, it was not in force at the time of the death of Tennant; and the other that his death was not caused by external, violent, and accidental means, within the intent and meaning of the policy.

According to its terms the policy expired at noon of the twentieth of June, 1882. But it was continued in force from year to year until noon of the twentieth of June, 1885, by the issuance to the insured of renewal receipts expressly continuing it, subject to the provisions and conditions therein contained. The evidence shows that it was the custom of the company to send such renewal receipts, signed by the secretary, from the home office, in blank, and they were intrusted to the commissioned agents of the company, with authority to countersign and deliver the same from time to time, as occasion required, for the purpose of continuing in force expiring policies. The evidence further shows that, notwithstanding a clause of the policy to the effect that the actual payment of the premium before the happening of any accident is a condition precedent to its binding force, and that no waiver shall be claimed by reason of any act or acts of any agent unless such act or waiver be specially authorized in writing over the signature of the president or secretary of the company, the custom of the agents of the defendant was to give credit on the premiums, and such custom was acted on by the patrons of the company generally, and by the deceased in the present case, and was approved and ratified by the company by receiving and retaining, with full knowledge of the facts, the premiums paid pursuant to such credit. There is no difficulty, therefore, in holding that the policy in suit was continued in force until noon of June 20, 1885, by virtue of the delivery to the insured of the renewal receipts, and the subsequent receipt and retention by defendant of the premiums due thereon.

"The law of agency is the same," said Mr. Justice FIELD in delivering the opinion of the court in *Insurance Co.* v. *Wolff*, 95 U. S. 330, "whether it be applied to the act of an agent undertaking to continue a policy of insurance, or to any other act for which his principal is sought to be held responsible. The principle that no one shall be permitted to deny that he intended the natural consequences of his acts, when he has induced others to act upon them, is as applicable to insurance companies as it is to individuals. * * * The principle is one of sound morals, as well as of sound law, and its enforcement tends to uphold good faith and fair dealing. If, therefore, the conduct of the company in its dealings with the assured in this case, and with others similarly situated, has been such as to induce a belief that so much of the contract as provided for a forfeiture if the premium be not paid on the day it is due, would not be enforced if payment were made within a reasonable period after-

wards, the company ought not, in common justice, to be permitted to allege such forfeiture against one who has acted upon the belief, and subsequently made the payment. And if the acts creating such belief were done by the agent, and were subsequently approved by the company, either expressly or by receiving and retaining the premiums, the same consequences should follow."

But in the case at bar the insured died on the twenty-second of June, 1885. At the time of his death no premiums had been paid for insurance beyond noon of the twentieth of June, 1885; and it is insisted, on behalf of defendant, that, prior to his death, no renewal receipt had been issued by defendant's agent purporting to continue the policy in force beyond that date. If the matter last mentioned be true, then, clearly, the policy expired with noon of June 20, 1885; for no agent can any more bind his company by issuing a renewal receipt after the death of the insured than he could by issuing an original policy in favor of a dead man.

But is it true that the receipt in question was not issued until after the death of Tennant? There is no reason to doubt the testimony of the agent to the effect that on the twentieth of June, while the policy was in force, he filled out and countersigned a renewal receipt, purporting to continue the policy for another year, and that he did this by direction of the insured, who requested the agent to retain the receipt in his office, but for the insured; and it was there at the time of the death of the latter. The mere manual possession of the policy, or, in this case, the renewal receipt, is of little consequence. "Its possession by the insured makes a *prima facie* case for him, subject to be met by proof that it was never delivered by the consent of the insurers; while its possession by the insurers makes a *prima facie* case for them, subject to be met by proof that, though not transferred, it was intended by the parties to be a valid contract, without further action of either; and so in legal contemplation that there was a delivery." May, Ins. § 56.

When the agent of the defendant, while the policy was running, and during the life-time of the insured, and by his direction, filled out and countersigned the renewal receipt, he did precisely what the company authorized him to do. He was constituted its agent to contract with the insured for a renewal of the policy, and was intrusted with receipts in blank, signed by the secretary of the company, with authority to fill out and countersign them in execution of such contracts. And when, pursuant to that authority, the agent, at the request of the insured, filled out and countersigned the receipt in question, and thereupon assumed charge of it for the insured, the contract of insurance became complete and effectual. *Insurance Co. v. Colt*, 20 Wall. 569; May, Ins. § 60, and authorities there cited. I must find, therefore, that the renewal receipt was issued on the twentieth of June, 1885, during the life-time of Tennant.

To the objection that the premium was not paid until after his death, the answer is that the agent, pursuant to a custom known to and ratified by the company, extended to the insured credit for the premium; and

the latter, relying upon the credit thus extended, having deferred making the payment, it would manifestly operate as a fraud upon him to hold that the insurance did not become operative until the premium was actually paid.

The last point made for the defendant, however, I think must be sustained. It is, among other things, provided by the policy that the insurance shall not extend to any "bodily injury happening directly or indirectly in consequence of disease; nor to any death or disability which may have been caused wholly or in part by bodily infirmities or disease existing prior or subsequent to the date of the contract; * * * nor to any case except when the injury is the proximate and sole cause of the disability or death;" and, further, that no claim shall be made under the policy "* * * when the death or injury may have happened while the insured was, or in consequence of his having been, under the influence of intoxicating drinks." The evidence shows that the deceased was found dead in the plunge-bath at Gilroy springs, in Santa Clara county, about 10 o'clock P. M. of the twenty-second of June, 1885, in almost a standing position, with his right hand holding to the pipe that supplied the bath with water, and his head so drooped that the surface of the water extended above his nose, but left the top of his head exposed. There was an abrasion between his eyes, and a bruise on one side of his head. The bath was eight or ten feet square, and the water from four and a half to five feet in depth. The deceased was from five feet eight inches to five feet nine inches in height. The water is naturally warm, its temperature being from 100 to 105 degrees; the result being to fill the room with hot steam should the door be closed. In this instance the door was closed, the deceased having locked it from the inside. It further appears from the evidence that for many years the deceased was a free drinker of intoxicating liquors, and that for the last few years of his life he was a very heavy drinker. His physician testified at the trial that, during the latter part of his life, he drank to such excess as to bring on epileptic fits, from the effect of which he (witness) had relieved him. This witness further testified that, upon the recovery of the deceased from such attacks, he would resolve to cease drinking altogether, and that at the time of his death he was endeavoring to stop, but stopped too suddenly. He testified, further, in substance, that the entrance into the bath in question of one in the then condition of the deceased would be likely to result in an epileptic attack, and that the fall or blow that caused the abrasion between the eyes, and the bruise on the side of the head, were not sufficient to have caused death.

When it is considered that the evidence shows that the abrasion and bruise were but slight, and that deceased, when found, was in almost a standing position, with his right hand firmly grasping the supply-pipe, it is impossible to believe that his death was caused by a fall or blow. In view of all the facts and circumstances of the case, considering the condition of the deceased at the time of and just previous to his death, the probable effect of the heat of the bath upon one in his condition, his position when found, and the condition of his body after death, it seems

to me to be clear that he came to his death through other causes than "external, violent, and accidental means, within the intent and meaning" of the policy in suit, and I must so find.

Upon this ground there must be judgment for the defendant; and it is so ordered.