## C. E. THUM, RECEIVER OF C. BUNTING & CO., BANKERS, A CORPORATION, Respondent, v. DANIEL WOLSTENHOLME, Appellant.

Insurance — Delivery of Policy — Execution of Premium Note — Payment. Life Insurance Policy — Containing Condition Precedent — Annuity. Negotiable Note — When Payment of Premium on Life Insurance — Estoppel. Legal Title to Insurance Policy Vested by Payment of First Annual Premium. Equitable Lien — On Proceeds of Life Policy — For Trust Funds Invested in Premiums. Fund Created by Misappropriation of Trust Funds — How Far Impressed with Trust by Court of Equity.

*Insurance — Delivery of Policy — Execution of Premium Note — Payment.*

Where it appears that upon the issuance and delivery of a life insurance policy a note is executed and delivered by the assured to the general agent of the insurance company for practically all the first premium ; that the note bears the same date as the policy ; and the policy was among the effects of the assured at the time of his death, the presumption is that the policy was delivered at the time it bears date ; that the difference between the face of the note and the amount of the premium was paid in cash or arranged by the assured, and the giving and delivery of the note and the receiving of the policy must be held to operate as a payment of the first annual premium.

*Life Insurance Policy — Containing Conditions Precedent — Annuity.*

A life insurance policy which stipulates for the payment of an annual premium by the assured, with a condition to be void in case of non-payment, is not an insurance from year to year, but the premium constitutes an annuity, the whole of which

is the consideration for the entire assurance for life, the condition is a condition subsequent, making the policy void by non-performance, and the acceptance of a note for the annual premium is a waiver of the payment of the premium, and brings into operation the conditions in the policy referring to the note.

*Negotiable Note — When Payment of Premium on Life Insurance — Estoppel.*

The giving and acceptance of a negotiable promissory note for the first annual premium on an insurance policy, at the time of delivery of the policy and its subsequent sale and indorsement before maturity, operates as a payment of the premium, for the first year even if the note was never paid and, as between the maker and the insurance company, as a collection of the note, and the company is thereafter estopped from claiming a forfeiture of the policy because of the non-payment of the note.

*Legal Title to Insurance Policy Vested by Payment of First Premium-Trust.*

Where the first annual premium on a policy of insurance is paid by giving and accepting a note and delivering the policy, the legal title to the policy and its proceeds vests in the assured, and the subsequent payment of premiums maturing thereafter out of funds belonging to a bank in which the assured is a large stockholder and of which he is manager can not create a trust in favor of such bank.

*Equitable Lien — On Proceeds of Life Policy — For Trust Funds Invested in Premiums.*

After an assured has obtained title to a policy of insurance, if he uses funds of a bank of which he is manager, in paying subsequent premiums, and such funds can be traced "into the policy," a court of equity will give a lien for such sums and interest on the proceeds of the policy.

*Fund Created by Misappropriation of Trust Funds — How Far Impressed with Trust by Court of Equity.*

Where a fund sought to be impressed with a trust is grossly disproportionate to the amount of the trust funds alleged to

have been used in the creation of such fund, courts of equity will not decree the entire fund as a trust fund, but will allow a lien for the trust funds used.

*Resulting Trust — Equitable Lien.*

While Bunting was owner and manager of the Bunting Bank, a corporation, which was insolvent, although it paid its debts, he insured his life with the New York Life Ins. Co., for $50,000, payable to his heirs, and gave his negotiable note due in six months to Fritter, the general agent of the Company, for $1,500, and other considerations for the payment of the first premium. The policy was delivered to Bunting in exchange for the note. Fritter thereafter, and before maturity, transferred the note to the Pocatello bank for value, which bank forwarded the same to the Bunting Bank for collection and the amount was credited to the Pocatello Bank, which bank was then owing the Bunting Bank. Two other notes were given the insurance company for other premiums on the policy which were afterwards paid by Bunting's bank. Bunting died after the third note was paid, and the $50,000 was paid on the policy to defendant.

In a proceeding by the receiver of the Bunting Bank to impress all the insurance fund of $50,000 with a trust for the $5,110 paid by the bank, *Held*, that the note given in payment of the first premium having been sold and transferred by the insurance company before due, vested the title to the policy in Bunting on its delivery; that the sale of the note by the insurance company, operated as between the company and Bunting, as a collection of the note.

By giving the $1,500 note to Fritter, and paying the balance of the first premium and receiving the policy, Bunting acquired the legal title to the policy and its proceeds, and no subsequent payments of premium maturing thereafter, out of the funds of the bank, would create a trust in favor of the bank. The trust, if any, must arise or result from the transaction whereby the trustee acquired the legal title or right to the property in which the trust is claimed, and it must arise at the time the legal title is obtained by the trustee, and not afterwards.

While the fund was not impressed with a trust such as would
absorb the fund, yet it was subject to an equitable lien in the
nature of a resulting trust to the amount of the bank's funds
used in paying the second and third premiums, with interest.

(Decided April 30, 1900.)

Petition for re-hearing denied May 23, 1900.

Appeal from the Third District Court, Salt Lake
County, Hon. Ogden Hiles, *Judge.*

This was an equitable action brought to recover a
fund amounting to $50,000 alleged to be held by the
defendant, and to have been acquired by him as trustee of
C. Bunting, etc., bankers, a corporation organized under
the laws of Utah. It was claimed in the complaint that
this fund was derived from the proceeds of a life insurance
policy issued on the life of Charles Bunting, deceased, for
the sum of $50,000, payable on the death of Bunting to
his estate. From a judgment for plaintiff, defendant
appealed. *Reversed.*

*Messrs. Dickson, Ellis, and Ellis,* for appellant.

By the unconditional delivery of the policy, as pleaded
and proved in the given circumstances, as a completed
and executed contract, under the express or implied agree-
ment that a credit had been given for the premium, the
company became liable for any loss. *Farnnen* v. *Phœ-
nix Ins. Co.*, 83 Cal., 246, and many cases cited.

The note having been given for the premium in a
negotiable form, and afterward negotiated and passed out
of the hands of the payee, and treated as payment by the
insurance company, it was payment. *Hart* v. *Boller*, 15
S. and R., 162; *Riverside Iron Works* v. *Hall*, 64 Mich.,
168; S. C., 31 N. W., 152; See also, 2d Beach on Ins.,

Secs. 769, 770, 773, and Sec. 971, and cases there cited.

Under any circumstances the payment of this note, long after the insurance had been purchased, had become operated, had been paid for by the note, and the policy delivered, and the note indorsed and sold, can not be held to be in any just or proper sense a withdrawal of money of the bank for making a purchase of the life insurance in question. It was but a method of obtaining means to pay the note or debt of Bunting, and no trust can therefore arise, and so it has been held. *Bosworth, et al.*, v. *Hopkins, et al.*, 85 Wis., 63.

On the question of the payment of premium by note, and the effect of the delivery of the policy, and waiver of prepayment, see 1st Joyce on Ins. Secs. 76, 80–85, and Vol. 2 Joyce, Sec. 1202; as to Bunting's right of assignment, see 1st Joyce Ins., Secs. 152, 154.

No oral agreements, and no payments before or after the title is taken, will create a resulting trust, or trust by implication of law, unless the transaction is such, at the moment the title passes, that a trust will result from the transaction. Perry on Trusts, Secs. 133, 842, and 126–131; *French* v. *Shopler*, 83 Ind., 266; 43 Am. R., 67; *Bosworth, et al.*, v. *Hopkins, et al., supra; Buck* v. *Sweeney*, 35 Maine, 41, 50, 51; *Pinnock* v. *Clough*, 16 Vt., 500; *Woodside* v. *Herner*, 109 Cal., 485, 486; 1st May on Insurance, 108, 117; *In re* Wood, 5 Fed. Rep., 443; *Fulton* v. *Jonson*, 99 Cal., 587, 591; *Botsford* v. *Burr*, 2 Johns. Ch., 405; *Coles* v. *Allen*, 64 Ala., 95; *Rogers* v. *Murry*, 3 Paige, 390, 398; Pomeroy's Eq. Jur., Sec. 1037; 2 Washburn on Real Property, 173.

The presumption is, that when Fritter indorsed the note without recourse to the Pocatello bank, he did it for a valuable consideration, the amount of which is not material, but presumptively was the face value of the

note. The law merchant raises this presumption. See Note 1 to Sec. 13, Randolph Commercial Paper; 1st Daniel Negotiable Instruments, Sec. 160, *et seq.*, Chapter VII; 42 Mich., 19.

Again, this life insurance policy, so far as appears, was not an assurance for a single year, with a privilege of renewal from year to year, or to become a contract only upon actual payments of money, as contended by counsel, but it was an entire contract of insurance for life, possibly, and probably subject to a discontinuance. and forfeiture for non-payment of any of the stipulated premiums. *Mut. L. Ins. Co.* v. *Pruett,* 74 Ala., 487; *N. Y. Ins. Co.* v. *Statham, et al.,* 93 U. S., 30; *Ins. Co.* v. *French,* 30 Ohio St., 240; *Thompson* v. *Ins. Co.,* 104 U. S., 257.

The authorities are to the effect that the principles decided in the cases which we have cited, apply equally to personal property and to real estate. Perry on Trusts, Secs. 129, 130.

If the transaction was void because *ultra vires,* or because Bunting was disqualified, as matter of law, from entering into it for want of authority from stockholders, when there were no stockholders except himself, then it is void as to all persons whomsoever, because a transaction that is absolutely void and of no effect, as held by the court below, can not be valid as to some people, and void as to others.

But the holding is not the law, and Bunting did have the power and authority, as manager and stockholder, to enter into the transaction and to make the sale and entries, and so it is held. See *G. V. B. Mining Co.* v. *First N. Bank,* pp. 33 and 34; U. S. Court of Appeals, 9th Circuit; 95 Fed. Rep., No. 1, Aug. 8, 1899.

The transaction itself operates as a ratification by all the stockholders, and nobody else has a right to complain.

See also, *Mc Cracker* v. *Robinson*, 6 C. C. A., 400; 57 Fed., 375–377; *Barr* v. *Railroad Co.*, 125 N. Y., 263–273; *Wood* v. *Water Works Co.*, 44 Fed., 146–151.

This court can render a judgment on the merits in favor of the defendant, but can not render a judgment in favor of the plaintiff, because an indispensable party has not been made a party defendant on the record; namely, the administrator of the deceased, Bunting. *Shields* v. *Barrow*, 17 How. (U. S.), 130; *Swan Land Co.* v. *Frank*, 148 U. S., 611.

*Lyttleton Price, Esq.*, and *Messrs. Brown and Henderson*, for respondent.

The capital stock and assets of a corporation is a trust fund for the security of the creditors of the corporation. The corporate creditors are to be paid first out of the assets, including the capital stock of a corporation, and they have a first lien upon it, and whenever a corporation becomes insolvent, this trust attaches. 3 Thompson on Corporations, Secs. 2951, 2952, and cases cited in note; 5 Thompson on Corporation, Sec. 6555; Story's Eq. Jur., Sec. 1252; *Wood* v. *Dummer*, 3 Mason (U. S.), 308.

This trust which is declared and enforced, amounts, during solvency of the corporation, and in fact during all the time that it continues active business under the direction of its board of trustees or directors, as a mere trust. It is not an active trust, which attaches to the property. The managing board of directors remain and continue to be the administrators of the fund; they may buy and sell, they may mortgage, and do anything within the powers of the corporation, which is done in good faith and for legitimate purposes. So long as they do nothing that is illegal, *ultra vires*, or dishonest, the courts will

not disturb their action. The trust only attaches to the property, and becomes an actual, active, and existing lien upon the property, when the corporation and its assets have passed into the jurisdiction of a court of equity, and then any improper disposition of the property will be set aside and vacated, and this trust enforced. *Weyeth H. M. Co.* v. *James Spencer B. Co.*, 15 Utah, 110, 130–135; *Hollins* v. *Iron Co.*, 130 U. S., 371; *Bank of Montreal* v. *J. E. Potts S. and L. Co.*, 90 Mich., 345; *Wood* v. *Dummer*, 3 Mason, 308; S. C. Fed. Cases, 17944.

Note: This last case is the one in which Judge Story first announced the doctrine. *Fogg* v. *Blair*, 133 U. S., 534.

It is a universal and elementary rule of agency that an agent can not act both for himself and his principal in a transaction in which he is interested, that is, he can not deal with the principal through himself. And this principle applies to officers and agents of a corporation. A transaction made by an agent or officer of a corporation where the corporation is an interested party on one side and the agent on the other, is void. *Victor M. Co.* v. *Nat. Bank*, 49 Pac. (Utah), 828; *Bank* v. *Gifford*, 47 Iowa, 575; *Bear R. V. Orchard Co.* v. *Hawley*, 50 Pac. (U. T.), 614; *People* v. *Township Board*, 11 Mich., 222; *Clafin* v. *Farmers' Bank*, 25 N. Y., 294; *N. Y. Iron Mine* v. *Nat. Bank*, 39 Mich., 645; *San Diego* v. *San Diego R. Co.*, 44 Cal., 113; *Andrews* v. *Pratt*, 44 Cal., 317.

Where the agent of a corporation acting solely for the corporation in a transaction in which he is personally interested, the transaction itself is void; it lacks the elements of a contract; the minds of the contracting parties have not met upon any proposition. *People* v. *Township Board, supra; Clafin* v. *Farmers' Bank, supra.*

A corporation is a distinct entity, a thing apart and separate from any of its members. A corporation with one stockholder — not being a corporation sole — is, while an anomaly, nevertheless a thing which sometimes exists, and the fact that the corporation has but one stockholder is in no sense and under no circumstances different from any other corporation in character or attributes, and the owner of all the stock does not therefore own its property or any of it, and does not himself become the corporation as a natural person. Cook on Corporations (2d ed.), Sec. 709; *Burton* v. *Hoffman*, 61 Wis., 20; S. C., 20 N. W., 668; 1 Morawetz on Corporations, Sec. 232; *Harrington, Rec.* v. *Connor*, 51 Neb., 241; S. C.; 70 N. W., 911; *England* v. *Dearborn*, 141 Mass., 591; *Winona, etc., R.* v. *St. Paul R. Co.*, 23 Minn., 379.

The rule that the identity of a corporation is not lost by the fact that a single individual becomes the owner of all its stock, is a rule of substance, and serves a proper, legitimate purpose. The creditors of a corporation, upon insolvency or dissolution, have the right to resort to its assets, including its capital stock, for the payment of their debts, and the creditors of the individual who owns the stock of the corporation, upon his insolvency or death are entitled to share in his property for the payment of their debts. This is illustrated where one corporation sometimes becomes the owner of all the stock of another corporation, and they both become insolvent and their affairs are wound up in a court of chancery, and the courts under such circumstances carefully distinguish between the two corporate entities, and the reason for the rule is fairly stated in the case of *Harrington, Receiver*, v. *Connor, supra*; *Parker* v. *Bethel Hotel Co.*, 96 Tenn., 232; *Wilde* v. *Jenkins*, 4 Paige, 481.

The articles of incorporation under the general law of

the State, with the provisions defining their effect, constitute the charter of the corporation, and such a corporation can only exercise such powers as are expressly mentioned in its charter, and can not engage in any business not fairly within the purpose of the corporation as therein stated. *North Point Con. Irr. Co.* v. *Utah and S. L. C. Co.*, 52 Pac. (Utah), 168; *Thomas* v. *Railroad Co.*, 101 U. S., 71; *Rhorer* v. *Middleboro Town and Land Co.*, 44 S. W. (Ky.), 449; *Green Bay and M. R. Co.* v. *Union Steamboat Co.*, 107 U. S., 100.

The trust which is here sought to be established and enforced is a "constructive" trust, and not a "resulting" trust. It is a trust *ex maleficio*, that is, that Bunting was the sole manager of the bank, being its vice-president, and had the entire direction of the business; that as such he wrongfully took from the funds of the bank the money, and paid for this insurance. We make this distinction between a "resulting" trust and a "constructive" trust in view of the argument made by the defendant, to which we hereafter call attention.

We rely upon the general equitable principle that beneficiaries in a trust fund which has been misappropriated, can follow that fund and can recover it or the proceeds of it so long as the identity of the trust fund can be traced into the property sought to be recovered, and can identify and distinguish the property from all others. 2d Story's Equity Jur., Secs. 1258, 1259; 2 Perry on Trusts, 835, *et seq.*

The principles of constructive trust apply to a fund realized from policies of insurance which have been paid for money wrongfully taken from trust funds. *Holmes* v. *Gillman*, 138 N. Y., 369; *Shaler* v. *Trowbridge*, 28 N. J. Eq., 595, and authorities cited.

In the first place, the principle relied upon by the

defendant, that the money should actually be paid out at the time of the original transaction, and that the trust must then actually exist or it never can, has no application whatever to a constructive trust such as we set up, but it is stated by authors and cases to be a principle attaching to resulting trusts. Both of these trusts are classes of implied trusts.

But they arise differently, and are governed by very different principles. 1 Perry on Trusts, Sec. 166; 2 Pomeroy Eq. Jur., Secs. 1030, 1031, 1044.

The distinction between the two is sometimes confounded, and in many of the authorities where the principles that are common to both are discussed, they are not distinguished, but the distinction is important, and should be borne in mind. See note 1 to Sec. 1037, p. 610, 2 Pom. Eq. Jur.; 2 Pom. Eq. Jur., Sec. 1030 and Note 1, p. 604.

In the following cases a trust was impressed, even in cases of a resulting trust, where money was taken and applied in pursuance of a contract made before the payments were made and after the person sought to be charged with the trust had made payments of his own. *Mosteller* v. *Mosteller*, 20 Pac. (Kan.), 464; *Gilchrist* v. *Brown*, 30 Atl. (Pa.), 839; *Moore* v. *Moore*, 19 South, 953.


Miner, J.

This equitable action was brought to recover a fund amounting to $50,000, alleged to be held by the defendant, and to have been acquired by him as trustee of C. Bunting & Co., bankers, a corporation organized under the laws of Utah.

It is claimed in the complaint that this fund was derived

from the proceeds of a life insurance policy issued on the life of Charles Bunting, deceased, for the sum of $50,000, on November 29, 1894, payable on the death of Bunting, to his estate.    The testimony shows that in case of loss, the policy was payable to his heirs, executors, or assigns. Therefore this action was brought to recover this fund upon the ground that the sum of $5,110 of the money of C. Bunting & Co., bankers, of which the plaintiff is the receiver, was used by Bunting from the funds of C. Bunting & Co., bankers, in the payment of three premiums on the life policy prior to his death, and that a trust resulted in favor of the bank and its receiver to the extent of the entire sum of $50,000, derived from the policy.    It is also alleged, and not denied, that in 1896 the policy was assigned to the defendant.    The testimony shows that it was assigned in August, 1896, and that the insurance company then sent the usual notice for payment of the premium to the defendant.    It is also alleged that the assignment was made without any consideration.    This allegation is admitted.    In May, 1897, after proof of Bunting's death, the insurance company paid to the defendant the full amount of the policy.

C. Bunting & Co., bankers, was organized December 9, 1892, and Bunting, up to the time of his death, which was on May 16, 1897, was its general manager, and since October 14, 1893, had owned all the stock of the bank.

It is also alleged that to pay the first premium on July 1, 1895, Bunting executed his note, which he caused to be discounted at his bank; that the second premium, due November 22, 1895, was paid by draft on the bank, and third premium, due November 9, 1896, was paid by charging the same to his own account.

It is further alleged in the complaint, that in his lifetime the said Charles Bunting procured his life to be insured

on or about the 29th day of November, 1894, by a life insurance policy, executed by the New York Life Insurance Company, in the sum of $50,000, payable to his estate in the event of death; that a policy was duly issued to him therefor, as aforesaid, by said life insurance company; that at the time of such payments Bunting had no credit or funds in the bank with which to pay the same; that said sums taken from the bank for such purposes amounted to $5,110; that such money was the property of the bank; that such bank was in truth insolvent during a large portion of the said three years prior to the appointment of the receiver on February 21, 1898, if an accounting had been had of its debts and assets.

Prior to October 14, 1893, Mr. Wallace owned an interest in the bank, and then sold his interest therein to Bunting.  Up to that time Bunting had had credit at the bank, and his overdrafts, when made, were paid by permission of the board of directors.

Upon the hearing in the court below it was ordered and decreed that the fund so received by the defendant was impressed with a trust, and the defendant was ordered to turn over to the plaintiff the entire fund of $50,000. From this decree the defendant appealed to this court.

The testimony shows that on November 29, 1894, for the purpose of insuring his life in the New York Life Insurance Company for $50,000, Bunting gave his note for $1,500, payable to his own order on July 1, 1895, and that he delivered the same, indorsed, to W. C. Fritter, who was then the general agent for the State of Idaho, for said insurance company.  The policy was delivered to Bunting at the same time.  The complaint alleges the delivery of the policy to Bunting, and it bears the same date as the note.  It was found among Bunting's private papers after his death, and in the absence of proof to the

contrary, the general presumption is that the policy of insurance was delivered to Bunting at the time it bears date. Devlin on Deeds, Sec. 265; *Treadwell* v. *Reynolds*, 47 Cal., 171.

The amount of the annual premium on this policy was $1,805. The note given was for $1,500. Whether the agent discounted $305 from his commission, or whether Bunting paid the difference between the note and the full premium in cash, does not appear from the testimony given in the case, but it does appear that $1,805 was the full yearly premium on the policy which the company required to be paid. This sum must have been arranged or paid by someone. The policy was in the possession of Bunting. The presumption follows that it was rightfully there, and that he paid the insurance company the premium, amounting to $1,805, or the sum of $305 over and above the note for the first premium. But whether this $305 was actually paid to the agent, or whether the agent discounted that much from his commission, or made Bunting a present of it, would not change the result or effect of giving the note for the first premium. Bunting delivered the note to Fritter, and Fritter thereafter, before maturity, and for value, indorsed and transferred said note to the First National Bank at Pocatello. Thereafter, on July 6, 1895, the said last-mentioned bank forwarded said note for collection to C. Bunting & Company, bankers, and the amount of the note was paid by it, by charging to Bunting's account, and credited to the First National Bank of Pocatello. At this time Bunting's bank had a credit at the Pocatello bank. No money was actually paid by the Bunting bank, except as stated. Thum testified that Bunting told him that the note was given over to Fritter, the insurance agent.

The question arises whether the giving and delivery of

the note and the receiving of the policy operated as a payment of the first year's premium.

The note in question was a negotiable one, indorsed, delivered, and accepted by the insurance company as payment, of the premium, and thereafter by it sold and transferred, before maturity, for value

In *Riverside Iron Works* v. *Hall*, 64 Mich., 165, it is held that a draft or note is regarded as a payment whenever it appears that such was the intention of the parties, which may be shown by the acts and conduct of the parties, as well as by proof of an express contract or agreement; and the surrender of the evidence of the debt or liability strongly indicates such payment.

So in *Farnmen* v. *Phœnix Ins. Co.*, 83 Cal., 247, it is held that in case the policy had contained an express provision that the company should not be liable on the policy until the premium was paid (which is not shown) such provision is waived by the unconditional delivery of the policy to the insured as a complete and executed contract, under an express or implied agreement that a credit shall be given for the premium by note or otherwise, and in such a case the company is liable for a loss which may occur during the period of credit.

To the same effect are: 2 Parsons on Contracts, 624, *Thacher* v. *Dinsmore*, 5 Mass., 299; *Reed* v. *Insurance Company*, 59 Pac., 21 Utah,— 2 Greenl. on Ev., Secs. 52, 519; *American Cent. Ins. Co.* v. *Mc Crea*, 6 Lea., 520; *American Cent. Ins. Co.* v. *Mc Crea*, 41 Am. Rep., 647; *Tremont* v. *Travelers Ins. Co.*, 31 Fed., 322; 2 Beach on Insurance, Secs. 469, 770, 773; 1 Joyce on Insurance, Sec. 76.

In the case of the *Michigan Mutual Life Ins., Co.* v. *Bowes*, 42 Mich., 19, the court, speaking through Judge Cooley, on p. 22, in discussing a similar question, where

notes were given for a premium, said, "The company may have sold them (the notes), and this as between the company and Mrs. Bowes (the assured) would have been equivalent to collection."

A life policy which stipulates for the payment of an annual premium by the assured, with a condition to be void in case of non-payment, is not an insurance from year to year, but the premium constitutes an annuity, the whole of which is the consideration for the entire assurance for life. The condition is a condition subsequent, making the policy void by non-performance of the condition. *N. Y. Life Ins. Company* v. *Statham*, 93 U. S., 24; *Mobile Life Ins. Co.* v. *Pruett*, 74 Ala., 487.

So if the note is given for the annual premium, the acceptance of the note is a waiver of the payment of the premium, and brings into operation such conditions in the policy referring to the note.

In this case the policy was not placed in evidence, no condition of invalidity is shown, and no violation of its provisions can be presumed.

The testimony clearly shows, and I find, that at the time of obtaining the policy Bunting gave his negotiable promissory note and indorsed it over to Fritter, together with the $305, previously referred to, as arranged, in payment of the first year's premium on the policy. The policy for $50,000 was then delivered to Bunting. Fritter thereafter sold and indorsed the note to the First National Bank of Pocatello, without recourse. This constituted an absolute, completed transaction between the parties, and operates as a full payment of the premium for the first year, even if the note was never paid. The sale of the note to the bank by Fritter, operates, as between Bunting and the insurance company, as a collection of the note. The insurance company would thereafter

be estopped from claiming a forfeiture of the policy because of the non-payment of the note. So the insurance company would be estopped after it had collected subsequent premiums on the policy. The fact that Bunting afterward directed the cashier of the Bunting bank to pay the note at maturity, does not change the character of the transaction, nor create nor stamp the fund or the policy with a trust. It necessarily follows that the note and the $305, previously paid, make up the first year's premium on the policy, amounting to $1,805. This did not constitute a trust fund, and never was a part of the assets of the bank. The funds of the bank were not used in making the first payment, or any part of it, at the time Bunting obtained the actual ownership of the policy. So far Bunting must be held to have paid the full premium and to be the owner of the policy unaffected by any trust liability.

It also appears from the record that Bunting owned all the stock of the bank, was its president and manager, and without hindrance or question from the directors, managed and controlled its business. Since its organization in 1892, up to the time the receiver was appointed in 1897, it had done business as a bank, and was considered solvent during the years 1894, 1895, and 1896, so far as being able to pay and in paying its obligations as they matured. The acts of Bunting were open and not secretive. The fraud, if any, consisted in overdrawing his account at the bank which he owned, and in procuring and depositing as assets of the bank to his own credit $107,000 or more of securities which were by him as manager hypothecated in part to secure other obligations growing out of the bank's indebtedness. Bunting was evidently endeavoring to keep up the credit of the bank and to pay its obligations during a period when strong men

were driven into despair by a whirlwind of financial adversity, few of whom were able to withstand the gale. The securities he deposited shrunk in value, and many losses followed, but no intentional criminal dishonesty appears on the part of Mr. Bunting in his management of the bank, or in his endeavor to save it from financial ruin.

The record shows that on the 16th day of July, 1895, the $1,500 note was forwarded by the Pocatello bank to the Bunting bank, and it was paid by crediting the same to the former bank and charging the same to Bunting's account. It also appears that at the time of the payment of said note that Bunting had a balance to his credit of about $20,000 on the books of the bank. At the time the note was given in 1894, it does not appear that Bunting was indebted to the bank.

The second premium of $1,805 was paid by the bank November 24, 1895, on Bunting's check. At this time Bunting's account was overdrawn about $10,000. The third premium was paid on Bunting's check November 27, 1896. At this time Bunting's account shows a balance to his credit of over $9,000 on the books of the bank.

So far as I am able to judge from the testimony, with reference to Bunting's account at the bank, it appears that while he had a credit on the books of the bank, yet as a matter of fact he had deposited to his credit stock and shares of Bunting & Co., merchants, amounting to $107,000, besides other securities, that were in part fictitious, as some of it was held as securities for other debts, and was not paid for in full, so that considering these credits as made, his account was overdrawn after the 31st day of December, 1894.

For these reasons respondent seeks to charge the fund derived from the insurance policy with a constructive trust because the sum of $5,110 of the funds of the bank

were paid in premiums on the policy, and asks that not only the amount paid, but the whole $50,000 be turned over to the bank as impressed with a trust.

Sec. 124 of Perry on Trusts, defining resulting trusts, the author says, "There is another class of trusts which result in law from the acts of parties, whether they are intended to create a trust or not, and they are aptly designated as resulting trusts."

In Sec. 125, the author says, "In this chapter resulting trusts will be examined under five heads: (1) when the purchaser of an estate pays the purchase money and takes the title in the name of a third person; (2) where a person standing in a fiduciary relation uses fiduciary funds to purchase property, and takes the title in his own name." * * *

It will be remembered that the policy in question was payable to the heirs, executors, administrators, and assigns of Charles Bunting. By giving the $1,500 note to Fritter, who sold the same, and by paying the balance of the first premium and receiving the policy, Bunting acquired the legal title to the policy and its proceeds, and no subsequent payments of premium, maturing thereafter, by him out of the funds of C. Bunting & Co., bankers, could create a trust in favor of said bank or its receiver. The trust, if any, must arise or result from the transaction whereby the trustee acquired the legal title or right to the property in which the trust is claimed, and it must arise at the time the legal title is obtained by the trustee, and not afterward. This doctrine is sustained by the great weight of authority, and the principle applies to transactions of this character as well as to cases growing out of real estate transactions.

In Perry on Trusts, Sec. 133, it is said: "The trust must result, if at all, at the instant the deed is taken, and

the legal title vests in the grantee. No oral agreements, and no payments, before or after the title is taken, will create a resulting trust, unless the transaction is such at the moment the title passes that a trust will result from the transaction itself.''

*In re.* Wood, 5 Fed. Rep., 443, it is said: ''To raise such a trust where the purchase money is paid by one and the title taken by another, the entire purchase money must have been paid by such party; or if a part only be paid, such part must be paid for some aliquot part of the property, as a fourth, a third, or a moiety, and there must be no uncertainty as to the proportion of the property to which the trust extends. *Olcott* v. *Bynum*, 17 Wall., 44. And, again, such a trust must arise at the time of the purchase; it can not arise by after advances.''

In *Bosworth* v. *Hopkins*, 85 Wis., 50, 62, it is said: ''Whether any trust is to be implied in favor of the firm from the alleged secret or fraudulent use of its funds in making the purchase depends entirely upon the facts as they existed November 29, 1875, when the purchase was made, and the subsequent withdrawal of funds of the firm and use of the same in payment of part of the purchase money and interest remaining unpaid, and the payment of taxes or improvements on the land, can not be regarded as material to the rightfulness of the purchase. * * * And subsequent wrongful payments on the purchase price from the partnership funds pursuant to a land contract, and subsequent and prior to the deed, will not be ground for an implied trust, though the firm might, if necessary, have a lien against the land for sums so paid. *Conner* v. *Lewis*, 16 Me., 274; *Fulton* v. *Jenson*, 99 Cal., 587; *French* v. *Sheplor*, 83 Ind., 266; *Buck* v. *Sweeny*, 35 Me., 41; *Pinnock* v. *Clough*, 16 Vt., 500; *Case* v. *Codding*, 38 Cal., 181; *Monroe, et al.*, v. *Cummings*, 95 Mo.,

33; *Bottsford* v. *Burr*, 2 Johns. Ch., 405; Pomeroy's Eq. Jur., Sec. 1037; *White* v. *Carpenter*, 2 Paige Ch., 237; *Barnard* v. *Jewett*, 97 Mass., 87; *Tilford* v. *Towes*, 53 Ala., 120; *Coles* v. *Allen*, 64 Ala., 98; *Somers* v. *Overhulser*, 7 Pac. (Cal.), 645.

Under the facts shown the money derived from the policy is not made subject to or impressed with a trust in favor of the bank.

But it appears that the sum of $5,110, of the moneys of the bank was, after Bunting had obtained ownership and title to the insurance policy, used by him in making payments of premiums upon the policy as they matured. This sum is traced into the policy, and as we understand, counsel for the appellant upon the argument consented that this sum, with interest, could be allowed the bank, and made a lien upon the fund.

In Sec. 842, 2 Perry on Trusts, it is said : " Where the trust fund constitutes a part only of the purchase money of an estate, the court usually gives a lien on the land only for the amount of the trust fund invested and interest ; but where the entire land is the fruit of the trust fund, the *cestui que trust* has an election to take the land, or the trust fund and interest."

In 1 Perry on Trusts, Sec. 128, it is said : " If, however, a trustee purchase an estate with trust funds, and adds funds of his own to the purchase money, a trust will result to the *cestui que trust;* and the burden will be on the trustee to show the amount of his own funds in the purchase, otherwise the *cestui que trust* will take the whole. If the purchase is partly with trust funds and partly not, the *cestui* has a lien on the whole property for the amount of the fund misapplied."

In *Munro* v. *Collins*, 95 Mo., 33, it is held that where a trustee purchases an estate partly with his own funds and

partly with the trust money, the *cestui que trust*, on establishing the fact, will have a lien on the whole estate for the whole amount of the trust fund thus misapplied.

See also *Bosworth* v. *Hopkins*, 85 Wis., 50; *Bottsford* v. *Burr*, 2 John. Ch., 404; *Case* v. *Codding*, 35 Cal., 191.

The respondents insist that the $50,000 derived from this insurance policy, which was payable to Bunting's heirs, representatives, and assigns, should be impressed with a trust because $5,110 of the funds of the bank were used to pay the premiums. He demands that a court of equity shall allow the bank a return of the money invested and $44,890 as a just equivalent for the use of $5,110, for the time named. If the trust created were a constructive trust, and the payments were made of trust money at the time Bunting acquired the policy, this contention would seem more in accordance with the holding of many courts. But in this case, where the fund sought to be impressed with a trust is so grossly disproportionate to the amount of the trust funds alleged to have been used, the application of the rule is inequitable, and courts of equity are not required to do injustice; nor should such a doctrine be invoked under a state of facts like those under consideration in this case.

The case of *Holmes* v. *Gilman*, 138 N. Y., 369, which is relied upon by the respondent, differs materially from the case at bar. In that case Gilman embezzled $200,000 from the *cestui que trust*, and afterward insured his life for the benefit of his wife for $50,000, from the funds so embezzled. The court declared a trust upon the fund, but, on page 385, recognized the existence of the equitable rule here contended for without deciding the question, because it was not before the court. The court said :

"If the proceeds of these policies had been greater than

the whole amount of the indebtedness of the husband to the *cestui que trust*, arising out of the husband's breach of trust, we do not decide what might in equity be the different rights of the wife and the *cestui que trust* in the balance ; or whether any different rule could be logically applied.     The husband in this case converted $200,000 of what stood in the nature of a trust fund, and the plaintiff recovers only a little over one fourth thereof in case the judgment of the referee's report be affirmed.     We simply decide the case before us."

Here the insurance was made payable to Bunting's heirs, administrators, and assigns — in effect to his creditors, and $5,110 is the only sum charged in the complaint as having been in any manner misappropriated from the funds of the bank by Bunting.    This is the only allegation in the complaint, or claim on that subject, while $50,000 is sought to be applied to reimburse the trust fund thus alleged to have been depleted.

In the Gilman case, at the time the policy was obtained, all of the first premium was paid out of the trust moneys. In this case the first premium was paid by the note of Bunting, for which full credit was given by the company, which vested in him the legal title to the policy at the time of its delivery, relieved from any trust obligation.   In the Gilman case the policy was payable to his wife.   Upon his death the policy and proceeds thereof became her separate individual property.    In this case the policy was payable to Bunting's heirs, and thereby became a part of his estate, so that his creditors holding his promise to pay, and to whom he was indebted, could recover therefrom the amount due them.    In the one case there was an intent shown to defraud creditors, in the other an intent and disposition is shown to pay creditors.

In the case at bar, neither the insurance policy nor the

proceeds thereof, were ever impressed with a constructive trust. When Bunting paid, or arranged for the payment of, $305, and gave his note for $1,500 to Fritter, the agent of the insurance company, in payment of the first year's premium, and it was accepted as such, and the policy delivered; the title to the policy and the proceeds thereof became vested in Bunting. For all that appears if Bunting had died during that year, the company would have been liable on that premium for its full amount, even if the note had never been paid.

As it now stands, the policy having been made payable to Bunting's heirs, the fund necessarily belongs to the estate, and becomes liable for the payment of Bunting's debts, and all his creditors will share ratably in the fund according to the amount of their respective claims. But if the fund is impressed with a trust, then only the creditors of the Bunting bank, to the exclusion of other creditors, would obtain the sum of $44,890 over and above the amount invested by Bunting from trust funds, as a regard for his misappropriation of the funds of the bank.

To permit such a disposition of the fund in this case, would, to my mind, not only be an injustice to the heirs and creditors of Bunting, but would be an example against which the conscience of a court of equity would revolt. By giving its sanction to such a disposition of the fund a court of justice would indeed become an engine of oppression and injustice; while by returning the funds misappropriated, with interest, the injured parties are restored to their original standing, and the financial loss complained of is recompensed.

By insuring his life for the benefit of his estate, Bunting's creditors were, as it seems, placed in a better position than they otherwise would have been, and this was, possibly, his intention in obtaining the insurance. If he afterward

entertained the intention of assigning the policy to the appellant, he did not effectuate that purpose by delivering the assignment of the policy. It still belongs to the estate of Bunting. The respondent is restored to what belongs to it, and the heirs and creditors receive upward of $44,000 that they would not have received but for the alleged fraudulent acts of Bunting.

I am of the opinion that the plaintiff has an equitable lien in the nature of a resulting trust upon the fund in question for the amount of money of the bank used in paying the second and third premiums amounting to $3,610, with interest; but I can not allow the $1,500 advanced by the bank in payment of the note given by Bunting. That payment was of no legal benefit to him, and no equitable lien or trust can arise from its payment. As to Bunting and the insurance company, the premium for the first year was paid.

The record shows that the appellant obtained the policy, with the assignment thereof, attached thereto, after Bunting's death; that he paid no consideration therefor, and claims no interest therein, except as trustee, for the heirs of Bunting's estate.

Under such circumstances the money collected upon the policy belongs to the heirs of Charles Bunting, deceased, and should be paid to the administrator of Charles Bunting, deceased, after the payment by him of the sum of $3,610 to the respondent, with interest as stated herein.

It is therefore ordered that out of the $50,000 fund in the hands of the appellant that he pay to the respondent the sum of $1,805, with interest thereon from November 27, 1895, and the sum of $1,805 with interest thereon from November 27, 1896, and that the interest be computed at the rate of eight per cent per annum.

It is further ordered that the findings and conclusions

of the court below be set aside and vacated, and that the judgment and decree be reversed, and that findings and decree be entered in accordance with this opinion.

The costs of this case to be equally divided.

BASKIN, J., concurring.

It is alleged in the complaint "that in his lifetime the said Charles Bunting procured his life to be insured on or about the 29th day of November, 1894, by a life insurance policy, executed by the New York Life Insurance Company, in the sum of $50,000, payable to his estate in the event of his death; that a policy was duly issued to him therefor, as aforesaid, by said life insurance company; that in payment of the first premium, the said Bunting executed his note, due in July, 1895." These allegations were fully sustained by the evidence, and are not disputed by the appellant. It further appears from the evidence that the note so given in payment of the first premium was for $1,500, payable to Bunting's own order, on July 1, 1895; that Bunting indorsed and delivered the same to W. C. Fritter, who was the general agent of the insurance company, and represented it in the transaction; that said note and the policy are of the same date; that the agent afterward, for value, indorsed and delivered the same, without recourse, to the First National Bank of Pocatello; that upon the maturity of the note the same was presented to the C. Bunting & Co., bankers, of which Bunting was the manager and one of the directors, and was paid by the latter bank by crediting, under the direction of Bunting, on its bank books, the First National Bank of Pocatello with the amount of said note; that under the direction of Bunting, his account with C. Bunting & Co. was charged with the amount of

said note; that afterward two other premiums of $1,805 each, were paid out of the funds of C. Bunting & Co., on checks for the same drawn on said bank by Bunting.

There is some conflict in the evidence as to whether Bunting had any money to his credit in C. Bunting & Co. bank, when said note and the two other premiums were paid, but I think that the evidence shows that he had none. The complaint does not allege that Bunting was insolvent, either at the date of the policy or when such payments were made, and the only charge of fraud made against him in the complaint is that while he was the manager of C. Bunting & Co., he caused the note to be paid and drew checks on the bank, which were honored, when he had no money of his own deposited in said bank, and had no credit there upon which he was entitled to draw, or which he was authorized to use in the payment of his own obligations.

Before Bunting's death he assigned, without consideration, the insurance policy to the appellant. After the death of Bunting the appellant was paid $50,000 on the policy.

The respondent claims that from these facts there arose a constructive trust in favor of C. Bunting & Co., by virtue of which it became the equitable owner of said policy.

It is evident from the facts that upon the execution of the policy and the note given in payment of the first premium, the assured became the absolute owner of the policy, and that such was the intention of the insurance company when it issued the policy and received said note, and that the only consideration of said policy was said note, unless Bunting paid $305 — the difference between the principal of said note and the amount of the other premiums.

No funds of C. Bunting & Co., bankers, constituted any part of the consideration for the policy. The bank was not connected, in any way, with the transaction in which Bunting acquired the legal title to the policy, nor was it in any way injured thereby. Therefore the title which Bunting thus acquired was an absolute one. That Bunting became the absolute owner, and was such owner at the time the note was paid, is conclusively shown by the patent fact that if he had died before the payment of the note, the policy would not have been thereby vitiated, but upon his death could have been enforced against the insurance company. As the bank had no connection whatever with the matter until the note was paid, the alleged trust has no other basis than the payment of said note and the two subsequent premiums.

It follows that unless these payments divested Bunting of all or a portion of his legal title, no resulting or constructive trust arose in favor of the bank. From the nature of such trusts no such anomalous result as that is possible. No such doctrine has ever been laid down by any of the text writers or held by any court. Anyone who holds the legal title to either real or personal property can not be divested of all or any portion of his title in any such way; nor can any equitable interest in such property be acquired, as against the absolute title, in that way. Neither a resulting or constructive trust, in either real or personal property, can arise from anything which the owner of the legal title may do in regard to such property, after the legal title has been acquired. Equitable liens, however, may be created in favor of other persons by the subsequent acts of such owner. The only difference between a resulting and a constructive trust is well stated in respondent's brief, as follows: "Resulting trusts arise from an implied agreement; it is enforced as

an agreement, yet it arises by operation of law; it is implied, for instance, property is bought and paid for out of the funds of one person, and is deeded to another, a trust is implied in favor of the party who furnished the means. * * * Constructive trusts are wholly different from implied trusts in this: They arise out of some actual or constructive fraud; they are not upon the theory of an agreement or contract, but they arise out of the violation of some duty amounting to a fraud and are in *invitum*, and are enforced upon the party regardless of what his intention is.''

From the very nature of these trusts they can only be created by acts done in the acquisition of the legal title, and must vest in the *cestui que trust* the equitable title at the same time that the legal title vests in the trustee, and in cases of constructive trusts, the actual or constructive fraud upon which they arise must have been committed in the acquisition of the property to which the trust attached.

In 1 Beach on Trusts and Trustees, Sec. 180, p. 377, it is stated that, "Whenever it is shown that a fraud, either actual or constructive, has been committed in the acquisition of property, equity will raise a constructive trust in favor of the person defrauded." (See also the numerous cases cited in note 1, on said page.)

In all cases of resulting or constructive trust, there are two titles, one is legal the other equitable. The latter is the beneficial title, but when the legal title to property is an absolute one, there is no room for a trust. It is conceded by counsel for the respondent that Bunting acquired an absolute legal title to the policy. In their brief they say: "Of course the title to this insurance policy vested in Bunting, that is the very cause of the complaint. As long as he carried it without paying for

it out of the bank funds he had the right to it, but the moment he paid for it out of the funds belonging to the bank, equity thrusts upon it a trust by construction of law."

It is admitted by this statement, and such was the fact that up to the time the note was paid, the title of Bunting was as absolute as his title to any other property which he may have owned, and if it be conceded that by its payment he committed an actual fraud, and not an implied one, such payment does not raise a resulting trust in favor of C. Bunting & Co., because it was neither alleged in the complaint nor shown by the evidence that any fraud was committed in the acquisition of Bunting's absolute title to the policy.

The admission in the brief of respondent's counsel that "As long as he (Bunting) carried it (the policy) without paying for it out of the bank's funds, he had a right to it," shows that it is not claimed that fraud was committed in the acquisition of the title, but that the only fraud complained of and relied on was the payment of the note and premiums, after the absolute title of Bunting had been acquired.

The note was paid six months after, and the premiums respectively, in one and two years after the title to the policy had been acquired. The execution and delivery of the note was the sole consideration which induced the agent of the insurance company to issue the policy, and it would have continued to be in force if the note had never been paid. Neither did the payment of the note enhance the value of the policy or benefit it in any way. Therefore, C. Bunting & Co. acquired no rights in the policy by virtue thereof.

But the payment of the second and third premiums increased the value of the policy and kept it alive, and not-

withstanding these payments did not raise a resulting trust in favor of C. Bunting & Co., an equitable lien, in the nature of a resulting trust, was created in its favor on said policy and its proceeds for the amount of each of the last premiums, with legal interest.

In 2 Story's Equity Juris. (13th ed.), p..558, Sec. 1217, it is stated that "There are liens recognized in equity whose existence is not known or obligation enforced at law, and in respect to which courts of equity exercise a very large and salutary jurisdiction. In regard to these liens it may be generally stated that they arise from constructive trusts. They are therefore wholly independent of possession of the thing to which they attach as a charge or incumbrance, and they can only be enforced in courts of equity."

Pomeroy, in his work on Equity Jurisprudence, Sec. 166, asserts that it is more accurate to describe these liens as analogous to trusts.

In Jones on Liens, Sec. 28, it is stated that "Equitable liens do not depend upon possession as do liens at law. Possession by the creditor is not essential to his acquiring and enforcing a lien."

In the case of *Ferris* v. *Van Vechten*, 9 Hun., 12, it appears that an executor of an estate who had in his hands money of the estate sufficient to pay the creditors of the same, but instead of doing so he applied these funds in the payment of taxes and of repairs, and in removing a lien upon real estate devised by said will in trust for certain beneficiaries named therein. It was held that the funds so applied were held in trust by the executor, for the benefit of the creditors, and as the devisees had the benefit of the misappropriation of the fund, it became a charge upon the devised property. The real estate was accordingly sold to satisfy the lien thereby created.

The foregoing case, and the case of *Haddow, et al.*, v. *Lundy*, 59 N. Y., 320, are in point upon the question under consideration. The facts in the latter case are as follows: The defendant, Margaret Lundy, procured letters of administration on the estate of Robert Haddow, deceased, on the false and fraudulent representation that she was the widow of the deceased. Mary Haddow, the widow of the deceased, and his children instituted a suit to revoke the letters granted to the defendant, and to have letters granted to Mary Haddow, and to have certain funds of the estate, which the complaint alleged had been used by the defendant in improving certain real estate belonging to her, decreed a lien upon such real estate. The letters granted to the defendant were set aside, and Mary Haddow was appointed administratrix, and the amount of the money of the estate which the defendant had expended in buildings on her real estate was adjudged to be a lien on said real estate, and the same was ordered to be sold to satisfy the lien. The appellate court, in its opinion, said: "A portion of the money belonging to the estate was clearly traced into the building erected by the defendant upon her own land. Although she had also invested money of her own in the same building, the trust fund could, on familiar principles of equity, be followed as an equitable lien, and therefore adjudged and enforced by any appropriate remedy." The judgment of the lower court was affirmed.

The case at bar only differs from this case in this: The trust fund instead of being expended by the trustee in improving real estate which belonged to him, was used in enhancing the value and prolonging the life of an insurance policy, of which he was the owner.

In 2 Lewin on Trusts, 897, Sec. 10, it is said that, "Whenever a trust fund is traceable into land, and the

fund constitutes a part only of the money laid out in the purchase, the court has usually given a lien merely on the land for the trust money and interest."

The same practice is stated in Perry on Trusts, Sec. 842.

The principle underlying this practice is applicable to the case at bar, and when the money which belonged to C. Bunting & Co., that was expended for the benefit of the policy, is repaid to it, with interest, out of the funds realized on the policy by the appellant, the requirements of equity will have been fully met.

As the assignment of the policy to Wolstenholme, the appellant, was made without consideration, he took and held the same subject to the equitable lien of C. Bunting & Co., and the receiver of said company is entitled to have paid to him, out of the funds in appellant's hands, realized on the policy, the amount of the premiums paid on said policy, with interest thereon at the legal rate, from the time each premium was paid; and for the additional reason that, as alleged in the complaint, the insurance was payable to Bunting's estate in the event of his death, and the appellant not having paid any consideration for the assignment, or having paid any premiums on the policy, he held the same merely as trustee, and as the money paid on said premiums is traceable into said fund, he holds said policy subject to said lien and in trust for the creditors of Bunting's estate, and for his heirs.

This view of the case is supported both by the principles of equity, and the authorities herein quoted.

I concur in the conclusion and judgment announced in the opinion of Mr. Justice Miner.

Per BARTCH, C. J., dissenting.

POLICY OF INSURANCE — WHEN BURDENED WITH TRUST — CONSTRUC-
TIVE TRUST. CORPORATION — STOCK OWNED BY ONE INDIVIDUAL
— CORPORATION STILL EXISTS. INSOLVENT CORPORATION —
RIGHTS OF CREDITORS TO FOLLOW ASSETS. PROFIT BY TRUSTEE
— BELONGS TO CESTUI QUE TRUST.

*Policy of Insurance — When Burdened with Trust — Constructive Trust.*

Where a policy of insurance is paid for entirely out of corporate
funds wrongfully and illegally taken by the insured out of
assets belonging primarily to the creditors of an insolvent
corporation, the policy and the proceeds become impressed
with a trust by implication of law, and the insured in his
lifetime held the policy as a trustee for the benefit of the cred-
itors and could not shake off the fiduciary character by as-
signment. In such case the law fastens a *constructive trust in
invitum* upon the conscience of the offending party.[1]

*Corporation — Stock Owned by One Individual — Corporation Still
Exists.*

Although one person owns a majority of the stock, or all of it,
or all but two shares, he does not in consequence thereof
acquire the right to act for the corporation, or as the cor-
poration, independently of the directors. One person may
own all the stock, and yet the existence, relations, and busi-
ness methods of the corporation continue.

*Insolvent Corporation — Rights of Creditors to Follow Assets.*

If insurance be procured with assets of an insolvent corporation,
which ought to be used in payment of the corporate debts,
the creditors have the right to follow the assets into the new
investment, and appropriate the proceeds in the hands of
those having full knowledge of the equities.

*Profit by Trustee — Belongs to Cestui que Trust.*

Where a trustee or other person standing in a fiduciary rela-
tion makes a profit out of any transaction within the scope of
his agency or authority, that profit will belong to his *cestui
que trust,* and the rule extends to all persons standing in a
fiduciary relation.

[1] *Wyeth H. & M. Co.* v. *James-Spencer B. Co.,* 15 Utah, 110; *Mercantile Co.* v.
*Mt. Pleasant Co-op. Inst'n,* 12 Utah, 213.

I am unable to agree with my brethren in the disposition they have made of this case. The action is a suit in equity brought by the plaintiff, as receiver of C. Bunting & Co., a corporation, organized under the laws of Utah, but which carried on a banking business in the State of Idaho, to recover a fund of $50,000, the proceeds of a life insurance policy, issued upon the life of Charles Bunting, now deceased, the fund having come into the possession of the defendant because of an assignment of the policy to him.

It is alleged in the complaint that the corporation was organized about December 9, 1892, for the purpose of doing a general banking business at Blackfoot, Idaho; that it carried on such business, at that place, until February 15, 1897, when having become insolvent, it closed its doors, and in a suit of a creditor against the bank in his own behalf and in behalf of all other creditors, brought in a district court of the State of Idaho, this plaintiff was appointed general receiver of the corporation, and thereafter in another creditor's suit brought against the bank in a district court of Utah, this plaintiff was appointed receiver for all the assets and matters pertaining to the corporation, existing and to be found in Utah; that the plaintiff qualified and is acting as receiver of the bank and its assets; that Charles Bunting, during the entire existence of the bank, was its acting general manager, directed its affairs, and held the office of vice-president; that about November 29, 1894, said Bunting procured his life to be insured, and had issued to him a life insurance policy, in the sum of $50,000, payable, in the event of his death, to his estate; that in payment of the first premium, the insured executed his note, due in July, 1895, and caused it to be discounted by his own bank; that at the time of the transaction he had no money of his

own on deposit in the bank and no credit upon which he was entitled to draw, or which he was authorized to use in payment of his own obligations; that all the premiums on the policy, aggregating $5,110, were taken by the insured from the funds of the bank, and used in the purchase of the insurance; that the money thus used was the property of the bank; that the bank was, in truth, insolvent, during a large portion of the three years prior to the appointment of the receiver; that in 1896, and before the payment of the last premium, the insured assigned the policy to the defendant, who paid no consideration whatever therefor; that after the assignment the insured retained possession of the policy, and continued to treat it as his own, and paid the last premium from the funds of the bank; that the insured died on May 16, 1897; that, after the death of said Bunting, the defendant procured possession of the policy from among the papers of the deceased, and thereafter received from the insurance company $50,000, the amount of the policy, and now holds the same in his possession; that in equity and good conscience the insurance money, so collected, belongs to and is the property of the corporation, and should be paid to this plaintiff as receiver; that the amount of the available assets to be distributed among the creditors was reduced by the amounts paid for premiums on the policy; and that, upon demand made, payment of the fund to the receiver was refused by the defendant.

The answer admits the corporate existence of C. Bunting & Co., bankers, the amount of the life insurance by Charles Bunting, the assignment of the policy to defendant, and the receipt of the sum of $50,000 as the proceeds of the insurance, which sum the defendant now holds in his possession. The other material allegations of the complaint appear to be denied.

From tho testimony introduced at the trial, the court, among other things, found that the banking corporation was duly organized under the laws of Utah, December 9, 1892, and thereafter did a general banking business at Blackfoot, Idaho, until February 15, 1897, when it ceased to do business, and has transacted no business since as a banking institution; that, on the day last named the plaintiff, in a suit brought in Idaho by a creditor, in his own behalf and in behalf of all other creditors, was appointed general receiver of the institution, and of all its property and effects; that thereafter, on February 21, 1898, in a similar suit brought in Utah, the plaintiff was appointed receiver of all the assets, causes of action, and other things pertaining to the corporation, existing or to be found in Utah; that he at once qualified, became, and still is such receiver; that during all the time the banking business was conducted, Charles Bunting had the exclusive management, control, and direction thereof, without the intervention of the board of directors or other officers, and was vice-president of the corporation; that from the time of its organization, and during all the time it transacted banking business, the corporation was actually insolvent, and was known to be so by said Bunting, but its insolvency was not known to the general public until the institution closed its doors; that about November 29, 1894, a policy of insurance was issued to Charles Bunting upon his life, payable to his estate after his death, and thereafter delivered to him; that said Bunting paid for the policy and each and every premium thereon, amounting to $5,110, with the money of the corporation taken by him wrongfully, unlawfully, and fraudulently, the last premium amounting to $1,805, being so paid by him about November 23, 1896; that in August, 1896, said Bunting executed an assignment of the policy to the

defendant, and notified the insurance company thereof, but the assignment and policy were retained in the possession of the insured until his death, which occurred May 16, 1897, when they were found among his papers and effects, and delivered to the defendant, who never paid any consideration, or parted with anything of value for the assignment of the policy, and never paid any part of the premiums; that the defendant has received the sum of $50,000 on the policy and has the same now in his possession at Salt Lake City, Utah; that after November 1, 1894, Charles Bunting had no money on deposit with the corporation or in the bank, and had no credit there upon which he was entitled to draw, or which he was authorized to use in payment of his own obligations, but during all the time his account was largely overdrawn, and, at the time of his death, for money taken without authority and abstracted from the assets of the corporation, he was indebted to it in a sum largely in excess of $150,000, no part of which has ever been paid; and that when the corporation ceased doing a banking business it was indebted to various persons in the sum of $251,635.-42, and the value of the assets did not exceed the sum of $100,000. Such, in substance, are the material findings of fact.

The evidence is quite voluminous, and appears to be amply sufficient to support the findings. The court, upon the facts found, made a decree directing the defendant to pay over to the plaintiff the $50,000 now in his hands, and which he received on the policy of insurance, with interest thereon from February 25, 1898, that being the date of the commencement of this suit, and to pay the costs of suit. Judgment was entered accordingly.

It is contended by the appellant, in the first instance, that when, on November 29, 1894, the policy in question

was delivered to Bunting, the insured, he thereby acquired the legal title to it, and to all rights thereunder, and that having thus the title or right of possession and the possession and right of assignment, he had the right to dispose of it or the proceeds thereof, either with or without consideration, regardless of any person except his then-existing creditors, and even as against them, provided he was then solvent and able to pay his existing debts.

This contention, in the absence of any fiduciary relations connected with the procurement of the policy, might be regarded as of considerable force, but the respondent maintains that the policy of insurance and the premiums were paid for entirely out of corporate funds, wrongfully and illegally taken by the insured,— out of assets belonging primarily to the creditors of the banking corporation, which, it is insisted, was at that time insolvent. If this be true, then not only the policy but its proceeds become impressed with a trust by implication of law, and the insured, in his lifetime, held the policy as a trustee for the benefit of the *cestuis que trust* — the creditors, and could not shake off the fiduciary character by assignment. The assignee, as to the policy and the proceeds thereof, stands exactly in the same relation as to the corporate creditors as did his assignor. If the bank was insolvent, and the insured purchased the insurance, and paid the premiums out of the corporate assets, the creditors, or the receiver, for their benefit, is entitled to the proceeds of the investment, so long as they have not passed into the hands of innocent third parties, who have had no notice of the facts in relation thereto. This is true regardless of the method by which such assets were obtained for the purchase. Where a corporation is insolvent, the assets constitute, in a certain sense, a trust fund for the payment, in the first instance, of the corporate debts, and the person

in charge of the fund is the trustee, and the creditors are *cestuis que trust*. If the trustee, in such case, purchases property with the assets, the transaction is looked upon as a purchase paid for by the *cestuis que trust*. "A purchase with trust funds is virtually a purchase for the *cestui*." 1 Perry on Trusts, Sec. 127.

In 2 Pomeroy's Eq. Jur., Sec. 1049, it is said: "Whenever a trustee or other person in a fiduciary capacity, acting apparently, within the scope of his powers,— that is, having authority to do what he does,— purchases property with trust funds, and takes the title thereto in his own name, without any declaration of trust, a trust arises with respect to such property in favor of the *cestui que trust* or other beneficiary. Equity regards such a purchase as made in trust for the person beneficially interested, independently of any imputation of fraud, and without requiring any proof of an intention to violate the existing fiduciary obligation, because it assumes that the purchaser intended to act in pursuance of his fiduciary duty, and not in violation of it." 1 Perry on Trusts, Secs. 128, 430; 2 Perry on Trusts, Sec. 838; *Tecumseh Nat. Bank* v. *Russell*, 50 Neb., 277.

Bunting could not invest the corporate assets of an insolvent concern, and then claim the benefits or profits of the investment, as against the creditors. While the assets of a corporation can not be and are not burdened with a specific lien or direct trust, in the absence of a valid judgment or recorded lien created by the parties, still, insolvency appearing, the creditors have a right to payment out of them before they can be appropriated for any other purpose. Such assets constitute a trust fund in the sense that the proceeds must, in the first instance, be applied to the payment of the corporate debts, and if, anterior to such payment, any portion of the fund be

invested in other property, the *cestuis que trust* have a right to follow the fund into such investment, so long as the purchase can be identified as made with such proceeds, and with knowledge of the facts. This court in *Weyeth H. & M. Co.* v. *James-Spencer B. C.*, 15 Utah, 110, said: "Doubtless, the assets of a corporation constitute, in a certain sense, a trust fund for the payment of its debts, in the sense that they can not be appropriated for any purpose foreign to its legitimate business, or distributed among its officers or stockholders, until all its debts are paid. This implies that creditors have an equitable right which may be enforced, when the assets have been taken into possession by a court of equity in a proper proceeding,. at the instance of a proper party." 2 Story's Eq. Jur., Secs. 1258, 1259; 2 Perry on Trusts, Secs. 828, 835, 838; 2 Pomeroy's Eq. Jur., Sec. 1049; *Mercantile. Co.* v. *Mt. Pleasant Co-Op. Inst'n*, 12 Utah, 213.

The trust arising under such circumstances, as are claimed to exist in this case, is a *constructive trust in invitum*, it not having been in contemplation of the parties at the time of making the contract. Such a trust is fastened upon the conscience of the offending party by mere operation of law and without his consent. It results from an abuse of fiduciary relations, misrepresentations, concealment, or other fraudulent practices, and a court of equity will convert him who has acquired property by any such method, into a trustee to execute the trust in such manner as to do justice between the parties. The right to pursue and claim property impressed with such a trust fails only when the means of ascertainment fail. This is upon the ground of the fraud connected with the transaction, creating, *in fore conscientiæ*, a trust in favor of the parties defrauded.

"A constructive trust is one that arises when a person, clothed with some fiduciary character, by fraud or otherwise gains some advantage to himself. Courts construe this to be an advantage for the *cestui que trust*, or a constructive trust." 1 Perry on Trusts, Sec. 27.

The same author, in Section 166, *Id.*, says: "If a person obtains the legal title to property by such arts or acts or circumstances of circumvention, imposition, or fraud, or if he obtains it by virtue of a confidential relation and influence under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, to hold and enjoy the beneficial interest of the property, courts of equity, in order to administer complete justice between the parties, will raise a trust by construction out of such circumstances or relations; and this trust they will fasten upon the conscience of the offending party, and will convert him into a trustee of the legal title, and order him to hold it or execute the trust in such manner as to protect the rights of the defrauded party and promote the safety and interests of society. Such trusts are called constructive trusts."

So, in 2 Pomeroy's Eq. Jur., Sec. 1051, it is said: "A constructive trust arises whenever another's property has been wrongfully appropriated and converted into a different form. If one person having money, or any kind of property belonging to another, in his hands, wrongfully uses it for the purchase of lands, taking the title in his own name; or if a trustee or other fiduciary person wrongfully converts the trust fund into another species of property, taking to himself the title; or if an agent or bailee wrongfully disposes of his principal's securities, and with the proceeds purchases other securities in his own name; in these and all similar cases equity impresses a constructive trust upon the new form or spe-

cies of property, not only while it is in the hands of the original wrongdoer, but as long as it can be followed and identified in whosoever hands it may come, except into those of a *bona fide* purchaser for value and without notice; and the court will enforce the constructive trust for the benefit of the beneficial owner or original *cestui que trust* who has thus been defrauded." 1 Perry on Trusts, Secs. 167–169; 2 Story's Eq. Jur., Secs. 1265, 1254, 1261; 2 Pomeroy's Eq. Jur., Secs. 1044, 1053, 1058; *Long* v. *King*, 117 Ala., 423; Thompson's Appeal, 22 Pa. St , 16; *Wells* v. *Robinson*, 13 Cal., 134; *Gale* v. *Harby*, 20 Fla., 171; *Bent* v. *Priest*, 86 Mo., 475; *Pres ton* v. *McMillan*, 58 Ala., 84; *Weaver* v. *Fisher*, 110 Ill., 146; *Hendrix* v. *Nun*, 46 Texas, 141; *Kayser* v. *Maughan*, 8 Colo., 232; *Mollinshead* v. *Simms*, 51 Cal., 158.

The principles above referred to apply with equal force where, as claimed in this case, the capital stock of the corporation is owned by one person. In such case the corporation still remains a distinct entity, and does not necessarily lose its individuality or identity as a business concern, nor the character or attributes of a corporation. Nor does the sole owner of the stock acquire the right to act for it, or transact its business independently of its agents and officers, or become the owner of its corporate property individually as a natural person. During the existence of the corporation he is a mere stockholder, and the corporate affairs must be managed by the board of directors, the same as where there is a plurality of stockholders. If, therefore, such stockholder invests the corporate assets for his individual benefit and advantage, or disposes of them without the sanction of the proper officers, his action in so doing is illegal and wrongful, and the creditors of the corporation, in case of its insolvency,

may follow the assets so invested or disposed of in the same manner as in the case of any other incorporation. The conveyance of all the capital stock to a purchaser gives him no right to carry on the business or dispose of or invest the assets as an individual. It simply gives him an equitable interest in the corporate property to carry on the business in the corporate name under the act of incorporation, and the legal title to the property or assets still remains in the corporation. Hence if such a purchaser, when the corporation is insolvent, uses the corporate assets or trust fund to purchase property for himself as an individual, such purchase is an abuse of a trust which can confer no rights upon him, or on those claiming under him, as against the *cestui que trust.*

In 2 Cook on Stock and Stockholders, Sec. 709, the author says: "Although one person owns a majority of the stock, or all of it, or all but two shares, he does not in consequence thereof acquire the right to act for the corporation, or as the corporation, independently of the directors. One person may own all the stock, and yet the existence, relations, and business methods of the corporation continue."

So, in *Button* v. *Hoffman*, 61 Wis., 20, after the stating of principles applicable to corporations, it was said: "These general principles sufficiently establish the doctrine that the owner of all the capital stock of a corporation does not therefore own its property, or any of it, and does not himself become the corporation, as a natural person, to own its property and do its business in his own name. While the corporation exists, he is a mere stockholder of it, and nothing else. The consequences of a violation of these principles would be that the stockholders would be the private and joint owners of the corporate property, and they could assume the powers of the

corporation, and supersede its functions in its use and disposition for their own benefit without personal liability, and thus destroy the corporation, terminate its business, and defraud its creditors. The stockholders would be the owners of the property, and, at the same time, it would belong to the corporation. One stockholder owning the whole capital stock could, of course, do what several stockholders could lawfully do.'' 2 Story's Eq. Jur., Sec. 1258; *Harrington* v. *Connor*, 51 Neb., 214; *England* v. *Dearborn*, 141 Mass., 590; *Winona & St. P. R. Co.* v. *St. Paul & S. C. R. R. Co.*, 23 Minn., 359; *Parker* v. *Bethel Hotel Co.*, 96 Tenn., 252; *Wilde* v. *Jenkins*, 4 Paige, 481.

The foregoing principles apply as well where the trust funds have been invested in an insurance policy as where the purchase consists of other property. This is so even where the policy is made payable to the estate, or the heirs of the insured. It is true where the insurance is procured with fund belonging to the insured, and in the absence of any violation of a trust, the beneficiary has a vested interest in the policy after it is delivered, but where the policy and premiums are paid for by the insured with funds impressed with a trust, and in violation of his obligations to the *cestuis que trust*, the beneficiary, under the policy, can only claim the insurance subject to the means with which it was procured, and existing equities, and must adopt the methods employed in procuring it. If, therefore, insurance be procured with assets of an insolvent corporation, which ought to be used in payment of the corporate debts, the creditors have the right to follow the assets into the new investment, and appropriate the proceeds in the hands of those having full knowledge of the equities.

These principles were similarly applied by a unanimous

court in *Holmes* v. *Gillman*, 138 N. Y., 369, a case from which Mr. Justice Miner quotes, and which he claims recognized the rule contended for and applied by him. The case will be more fully considered hereinafter.

So, the Court of Errors and Appeals of New Jersey, in *Shaler* v. *Trowbridge*, 28 N. J. Eq., 595, a case where the husband misappropriated funds of a partnership, and out of such funds paid the premiums on polices of insurance upon his life which were made payable to his wife, held by unanimous decision that thereby a constructive trust was created in favor of the partnership, and that the husband held the polices as a trustee, and after his death the wife held the proceeds as trustee for the firm, and she was not permitted to derive any benefit out of the insurance. Mr. Justice Syckel, delivering the opinion, after stating that it was "not a case of resulting trust," but one of "constructive trust," said: "If a person occupying a fiduciary capacity purchases property with fiduciary funds in his hands, and takes the title in his own name, he will, by construction, be charged as a trustee for the person entitled to the beneficial interest in the fund with which such purchase was made. * * * Nor does it make any difference that the investment turns out to be a profitable one, for whatever the profit may be, it must belong to the *cestui que trust*. It is a constructive fraud upon the latter to use his property unlawfully and to retain the profit of the misapplication, it being a fundamental principle in regard to a trustee that he shall derive no gain to himself from the employment of a trust fund." Again, he said: "It is urged that a life policy should be exempt from the equitable rule which applies to other transactions, because it differs in its character from ordinary investments, and is a beneficent provision for the family, which should be favored. Public policy clearly

forbids the adoption of this suggestion; it would invite the
commission of wrong by assuring the wrong-doer that there
is one mode in which he could secure profit by his turpi-
tude, in securing a provision for his family.    The policy
is the thing which the partnership money purchased, and
it stands in the place of what was corruptly abstracted.
Whether the policy would be productive, when terminated
by death, of more or less than the premiums paid upon
it, would depend upon the length of the life insured.
The fact that it has a continuent value does not distin-
guish it, in principle, from an investment in the purchase
of stock, or of an annuity, and ca · give no support to the
claim of the widow that nothing should be exacted of her
beyond the amount of premiums paid upon it out of the
firm funds.    If this suit had been prosecuted in the life-
time of the husband, and the policy had been disposed of
to the company for its surrender value, it would hardly
have been insisted that he could claim, in a court of con-
science, a right to any excess of the proceeds after refund-
ing to his firm the amount of the premiums.''    1 Story's
Eq. Jur., Sec. 322; 2 Story's Eq. Jur., Sec. 1261; 2
Pomeroy's Eq. Jur., Sec. 1048.

Viewing the case at bar as presented in the record, in
the light of the principles hereinbefore stated, is the con-
tention of the respondent that, at the time of the purchase
of the insurance, the banking corporation was insolvent,
and that the policy was procured, and the premiums thereon
paid for by the insured, with corporate assets, wrongfully
and unlawfully taken by him, correct.

Upon careful examination of the evidence, presented in
this voluminous record, and upon due consideration of the
able arguments of counsel on both sides, the conclusion
that respondent's position is well taken, seems irresistible.

On the question of the insolvency of the corporation,

the court found that from the time of its organization, and during all the time that it transacted banking business, it was actually insolvent, and its insolvency was known to Charles Bunting, the insured.    It is shown by the proof that Charles Bunting and two others, under the firm name of C. Bunting & Co., commenced doing business about 1879, as co-partners, and conducted a general banking and merchandise business until about December 9, 1892, when the banking corporation was formed, and the banking business and assets turned over to it.    Whether the court was warranted in finding that then, at the time of its organization, the corporation was insolvent, is not material, because there is ample evidence to show that from the beginning of 1894, which was prior to the procuring of the insurance policy, the banking institution was, in fact, insolvent, and remained so until it closed its doors in February, 1897.    This is apparent from the testimony of the witness Thum, who was Bunting's confidential man, was at times the bookkeeper and occasionally the cashier, and was familiar with the books and affairs of the institution, and knew what its assets and liabilities were, and finally when it failed was appointed receiver.    Early in 1894 he learned that the " bank was unable to pay its debts " and was insolvent.    That the institution was insolvent even prior to 1894, as found by the court, and since, also appears from the admissions of Bunting himself, which, as testified to by the witness Vogeler, are as follows: Mr. Bunting said that the failure was nothing more than he expected; he had expected for the last seven years, since 1890; he said that, in 1890, he wanted to go into voluntary liquidation, and his partners, Messrs. Lyman and Wallace, prevailed on him not to.    In 1893, they wanted, they requested him to talk over the matter, and asked if he had not better go into voluntary liquida-

tion, and he said, No, not at that time; values had depreciated so that it would be impossible for them to do anything to realize on any of their assets; he said it finally went on until it came on itself; that was the result.

The witness Thum also testified that, during the fall of 1894 and winter following, he had several conversations with Bunting on the subject of insolvency, and that Bunting said he could make no money at banking, and that "he must find some other means of making money in order to carry him through." The books of the concern likewise show insolvency.

From this and other evidence in the record, it is clear, not only that the bank and Bunting, who was its sole owner, were insolvent for a long time anterior to the purchasing of the insurance policy in November, 1894, and all the time since until the final collapse of the institution, but that Bunting all the time was fully cognizant of the fact. At the same time the depositors and confiding public were misled, and were unaware of the hazardous condition of the institution until the crisis finally came, and the doors were closed.

Under the circumstances disclosed by the testimony, the assets, according to the equitable principles already considered, and which, in my judgment, ought to be applied to such a case, were so impressed with a trust, for the benefit of the creditors, that they could not rightfully be appropriated for any purpose foreign to the legitimate business of the corporation, and the remaining vital question, therefore, is, Were the policy and premiums paid for out of the trust fund? If they were, the proceeds thereof should be regarded as a part of the fund, notwithstanding the assignment, which was made to one who is not an innocent purchaser for value, having paid nothing for it, and who, it seems, has no personal interest in it.

In behalf of the appellant, it is insisted that the insured used no trust money at all in the purchase of the insurance, but used his own money, and that, in payment of the first premium, he gave his own note, and thus used his own credit.

By the judgment which they announce, my brethren both admit that the second and third premiums were paid for out of the corporate assets.    Mr. Justice Baskin says: "There is some conflict in the evidence as to whether Bunting had any money to his credit in C. Bunting & Co. bank, when said note and the two other premiums were paid, but I think that the evidence shows that he had none."    This, since Bunting's note and the checks for the premiums were honored by the bank, is a clear admission that they were paid out of its assets.    Mr. Justice Miner, however, because the note was for $1500, while the premium was $1,805, and because the policy was in the possession of Bunting, says: "The presumption follows that it was rightfully there, and that he paid the insurance company the premium amounting to $1,805, or the sum of $305 over and above the note for the first premium."    In this connection my brother admits that "whether the agent discounted $305 from his commission, or whether Bunting paid 'the sum in cash,' does not appear from the testimony," and relies upon a presumption of payment in cash, but later on he seems to discard the presumption when he says: "The testimony clearly shows and I find, that at the time of obtaining the policy, Bunting gave his negotiable promissory note and indorsed it over to Fritter, together with the $305, previously referred to, in payment of the first year's premium on the policy."    It must be admitted that the actual payment, by the insured, of a part of the first premium with his own money, would have been an important fact in this

case, but, with all due respect to the views of my brother as to what the testimony shows, I have searched the record in vain to find evidence which, in my judgment, warrants either a presumption or a finding that the $305 was ever paid by the insured or anyone else. In fact, to my mind the record and evidence indicate exactly the contrary. The witness Thum testified that shortly after the purchase of the insurance, Bunting said to him "that he had taken out an insurance policy, and had given his note for the first premium," and told him to pay it when it came in. The witness was then conducting the business of the bank under Bunting's directions, and it will be noticed that Bunting did not say he had given the note for a part of the first premium, but "for the first premium," and I find not even a hint in the evidence that he ever claimed to have paid the $305. Again, the appellant in support of his motion for a new trial, filed an affidavit from Fritter, the agent of the insurance company through whom Bunting obtained the insurance and to whom he gave the note, but in that affidavit, from a man who knew absolutely what the fact was, there is not to be found a word about the payment of the $305, nor any reference thereto. Is it reasonable to suppose that, if such payment had been made, the able counsel who conducted the defense would not not only have shown it during the trial, but would also have failed to have the fact of payment stated in the affidavit in support of their motion, when the burden was upon them to show the existence of such facts as would warrant the court in granting a new trial? The real fact doubtless is that the $305 were never paid, but simply deducted from the commission.

Respecting the payment of the premiums and the ability of Bunting to pay, the finding of the court who heard all the testimony and observed the witnesses, in substance,

is that the insured paid for the "insurance policy, and each and every premium thereon, with the money of C. Bunting & Co., bankers," and that the money so paid was taken by him from the assets of the corporation wrongfully, illegally, and fraudulently. The court further found that, after November 1, 1894, the insured had no money on deposit in the bank, nor any credit there, upon which he was entitled to draw, or which he was authorized to use in payment of his own obligations; that all the time his account was largely overdrawn; and that at the time of his death he was indebted to the corporation "for moneys illegally and without authority taken and abstracted from the assets," in a sum in excess of $150,000. After examination of the evidence with care, I am of the opinion that the court was warranted and justified in finding these facts.

As shown by the transcript, Bunting's personal account, on November 1, 1894, was overdrawn $4,478.50, and on the 29th of November when the insurance was purchased the account was overdrawn more than $5,000, and continued so until the 31st of December, 1894, on which day Bunting, without action or consent of any board of directors, directed his bookkeeper to open a warrant and stock account, and to charge that account with 215 shares of the capital stock of the First National Bank of Pocatello, at $150 per share, amounting to $22,250, and with 750 shares of the stock of C. Bunting & Co., merchants, at $100 per share, amounting to $75,000. At the same time Bunting directed his personal account to be credited with the same items, amounting to $107,250. None of the stock was delivered to the bank. The witness Thum testified that, at that time the real value of the Pocatello bank stock was $125, and of the Merchant Co.'s stock $25 per share. At the very time of taking this credit 500

shares of the Merchant Co. stock had been pledged to McCormick & Co., of Salt Lake City, as collateral security for notes amounting to $71,000, and was never received either by the corporation or the receiver, and 55 shares only of the Pocatello bank stock came into the hands of the receiver. The balance of that stock also had been disposed of. Except for the credit so directed to be given, Bunting's personal account, on January 1, 1895, a month after the note in question was given, would have shown overdrafts amounting to over $51,000. If to this there were added the Bunting and Wheeler note, amounting to $4,500, on which he was obligated to the bank, and his Triumph mine account of $14,750.87, and the Bunting and Wheeler overdraft of $1,000, which account and overdraft Bunting, on December 31, ordered charged to to the profit and loss account, his debt to the bank on January 1, 1895, would aggregate over $71,000. Notwithstanding this fictitious credit so obtained by manipulation of the books, Bunting, at the time the note in question was paid, had a balance in his favor on his personal account of but about $20,000, and when the second and third premiums were paid, his account was again largely overdrawn. After December 31, 1894, Bunting continued in mining speculations. In addition to the Triumph mine, in which others were interested with him, he also developed the Viola mine. The expenses for developing were also paid out of the assets of the bank but not charged to Bunting. None of Bunting's mining transactions and speculations, so far as shown by the record, proved profitable. The evidence shows numerous reckless attempts to keep up credit. I will refer to but one more, which is the transaction with John D. Riter, who, as appears, sent $8,060 in certificates of deposit from another bank to Bunting or his bank for safe keeping. Bunting

drew the money on the certificates, the same being credited to his account, and the bank paid $222 interest thereon. How can a court of equity countenance such transactions as are revealed by this record ? How can such a court recognize a credit thus obtained, and defeat therewith the *bona fide* claims of creditors — depositors, many of whom, lulled into security by appearances, doubtless handed to the insolvent institution their small earnings and accumulations of years, only to have them abstracted and wasted in private and profitless speculations, foreign to the objects of the corporation, without the sanction of a board of directors ?

The credit obtained by the insured, who was the sole owner and manager of the bank, by directing his bookkeeper to open the warrant and stock account, and charge such account with the stock referred to, and then directing that he be credited on his personal account with those same items, when the same stock, or, at least, by far the greater portion of it, had already been pledged as security for a large debt owed by the insured, and when none of the stock was produced or transferred to the bank, did not add to the financial standing of the insured, nor to his actual credit at the bank. It was a mere fictitious credit and ought not avail the appellant in this case. The transaction was not authorized or ratified by the board of directors, but merely ordered by the insured. It was, therefore, unlawful, and served simply to conceal from the public the true financial condition of him who received the fictitious credit. Likewise, and for similar reasons, respecting the accounts with the several mining companies. It is true, the insured gave his note for the first premium, but that he intended the note should be paid out of the assets of the corporation clearly appears from the circumstances in evidence and his acts and conduct there-

after. The note was made payable at his bank, and shortly afterward he asked his agent, in charge of the bank, if it had come in, and, upon being informed that it had not, instructed him to pay it upon presentation. It appears the note was finally forwarded by another bank, a correspondent of Bunting's bank, for collection, and received by the latter bank as a check upon Bunting's account, and the amount thereof credited on the exchange account of the bank that forwarded it. The note thus simply amounted to a check drawn upon the bank, payable at a future day.

As has been shown, without the fictitious credits the account of the insured at his bank was, at the time of payment as well as the time of the making of the note, largely overdrawn. Hence, receiving the note as a check upon Bunting's account, and crediting it upon the exchange account, depleted the assets of the bank to the extent of such credit. The evidence likewise shows that the assets were depleted in a sum equal to the amount of the other premiums paid on the policy. So that the trust fund was reduced, at least in such sums, to the disadvantage and injury of the creditors, and in equity and good conscience they ought to be permitted to lay hold of the proceeds, so long as they have not passed into the hands of an innocent third person for value, without knowledge of the facts. The use of the trust funds, in the manner disclosed by the record, was wrongful, unlawful, and fraudulent as to corporate creditors. The proceeds should, therefore, be impressed with a trust no matter how circuitous or ingenious the method employed in securing the money to pay for the insurance, it clearly appearing that such money constituted a part of the assets of the insolvent institution. "The specific instances," says Mr. Pomeroy, in his Treatise on Equity Jurisprudence, Sec.

1045, "in which equity impresses a constructive trust are numberless, as numberless as the modes by which property may be obtained, through bad faith and unconscientious acts."

In 2 Story's Eq. Jur., Sec. 1261, the eminent author says: "Upon similar grounds, where a trustee or other person standing in a fiduciary relation makes a profit out of any transactions within the scope of his agency or authority, that profit will belong to his *cestui que trust*; for it is a constructive fraud upon the latter to employ that property contrary to the trust, and to retain the profit of such misapplication; and by operation of equity the profit is immediately converted into a constructive trust in favor of the party entitled to the benefit. For the like reason a trustee becoming a purchaser of the estate of his *cestui que trust* is deemed incapable of holding it to his own use, and it may be set aside by the *cestui que trust*. Nor is the doctrine confined to trustees strictly so called. It extends to all other persons standing in a fiduciary relation to the party, whatever that relation may be."

Mr. Justice Miner, however, says: "In a case like this, where the fund sought to be impressed with a trust is so grossly disproportionate to the amount of the trust funds alleged to have been used, the application of the rule is inequitable, and courts of equity are not required to do injustice; nor should such a doctrine be invoked under a state of facts like those under consideration in this case," and quotes *Holmes* v. *Gilman*, 138 N. Y., 369, hereinbefore referred to, as recognizing the rule contended for by him, that in such a case the *cestui que trust* has but a lien on the profits or proceeds to the extent of the trust funds misappropriated.

It is difficult to see how that case recognizes the application of legal principles which my brethren have made

in this. The case is very like the one at bar. There
Gilman, a partner, misappropriated funds of a partner-
ship and invested some of them in certain policies of
insurance upon his life, in favor of his wife and children;
here Bunting misappropriated funds of a corporation, and
invested some of them in a policy of insurance upon
his life in favor of his estate. There the amount of
insurance sued for was $56,000; here, $50,000. There
the premiums aggregated $4,000; here, $5,110. There
one policy of $5,000 was purchased, and the premiums
to a certain date paid for with Gilman's own money;
here all were ultimately paid for out of the assets of the
bank. There Gilman was the manager of the partner-
ship; here Bunting was the manager of the corporation.
There about the time of Gilman's death the partnership
was discovered to be insolvent; here shortly before Bunt-
ing's death the corporation was discovered to be insolvent,
and the proof shows that it was in fact insolvent for a
number of years previously. There, through Gilman's
management, the partnership was short over $200,000;
here, through Bunting's management, the corporation is
short over $150,000. There a court of equity decreed
to the *cestui que trust* over $50,000 proceeds of the
insurance; here a court of equity decrees to the *cestui que
trust* $3,610, and divides the costs equally between the
parties. Except as to the ultimate outcome it will be seen
upon examination and comparison that there is great resem-
blance between the main facts of the two cases. So, it
may be observed, upon examination, that the principal
legal questions presented in that case to the court of last
resort, were quite similar to those presented herein.
Counsel for the beneficiaries under the policies in the New
York case contended that the policies were contracts with
the wife, and, by the statute, were her property, free from

any claims against her husband; that assuming it to be true that in equity the *cestui que trust* may follow the trust funds used in "payment of the premiums on the policies, and impress the proceeds with a trust in his favor, he could not, under any principles of equity, obtain a lien for more than the gross amount of the moneys so applied, with interest;" that "Gilman being a partner in the firm, and being rightfully entitled as such to draw and use for his own benefit a part of the partnership funds, there was no appropriation by him of funds which can be followed in equity;" that "the funds appropriated by Gilman were taken in the form of money, and as such used in a transaction in the ordinary course of business upon a consideration valid as between himself and wife;" and that the evidence was insufficient to warrant a finding that he had wrongfully appropriated funds of the partnership. Notwithstanding these contentions, however, the court held that the *cestui que trust* had the right to follow the trust fund into the new investment, and appropriate the proceeds thereof.

Mr. Justice Peckham, now a justice of the Supreme Court of the United States, delivering the opinion of the court, said: "The claim of the plaintiff to recover the moneys arising from the payments of these policies is based upon the principle which allows a *cestui que trust* to follow trust funds, and to appropriate to himself the property into which such funds have been changed, together with the increased value of such property, provided the trust fund can be clearly ascertained, traced, and identified, and provided the rights of *bona fide* purchasers for value, without notice, do not intervene. The right has its basis in the right of property, and the court proceeds on the principle that the title has not been affected by the change made of the trust funds, and the *cestui que trust* has his

option to claim the property and its increased value, as representing his original fund. The right to follow and appropriate ceases only when the means of ascertainment fail.''

Then, in answer to the claim of the defendant that the payment of the premiums were mingled with the property right of the wife, and, therefore, the plaintiff could ''have only a lien on the policies or the moneys arising from their payment, to the amount of the premiums paid with the firm funds, and the interest thereon,'' which claim was characterized as presenting ''really the chief question in the case,'' the eminent jurist said: '' I am not at all prepared to admit that under no circumstances is the *cestui que trust* entitled to recover back anything more than the amount of his property and interest, where there has been a mingling of funds. In case the trustee took a thousand dollars of trust funds and five hundred of his own, and purchased property which advanced in value to twice its original sum, I have seen no case where the point has been determined that the whole increased value belongs to the trustee, and that only the original sum wrongfully taken and interest can be given to the *cestui que trust*, although it was by reason of the wrongful use of the trust funds that the trustee was enabled to realize such value. If in such case the *cestui que trust* were not allowed to at least participate proportionately in this increased value, it would appear to be a violation of the principle that the trustee can not ever be permitted to make a profit out of the use of trust funds. It seems to me to be a case for the application of the doctrine that the parties became co-owners of the property at the option of the *cestui que trust*, in the proportion which their various contributions bore to the sum total invested.''

And again, speaking to the point, that, when the

insurance was procured for the wife's benefit, the husband was acting as her agent, and that she had a vested interest in the policies the moment they were delivered, he said: "This is doubtless true in the case of the husband procuring the insurance with funds which belong to him or to his wife, but where the premiums are paid with moneys which in truth do not belong to him, and which the husband misapplies in so paying, and by which he violates his obligation to the true owner of the moneys thus used, the wife in such case must claim the policy subject to the means by which the husband procured it, and she must adopt all his methods. The moneys in the hands of the company could not be recovered back by the *cestui que trust* if received by the company in good faith, because it would stand in the position of a *bona fide* purchaser, yet the policy itself would stand as the representative of these trust moneys, and the right of the wife would be to that extent subordinate."

Thus it will be seen that the Court of Appeals of New York did not hesitate to apply, to a case similar to the one at bar, the principles herein contended for, nor to lay hold of the proceeds and impress them with a trust in favor of the *cestui que trust*, notwithstanding the fact that such proceeds were "grossly disproportionate" to the trust funds misappropriated.

Mr. Justice Miner finally assumes the position that, under the disposition made of this case, all of Bunting's "creditors will share ratably in the fund," and that "if the fund is impressed with a trust, then only the creditors of the Bunting bank, to the exclusion of other creditors, would obtain the sum of $44,890, * * * as a reward for his misappropriation of the funds of the bank," and says: "To permit such a disposition of the fund would, to my mind, not only be an injustice to the heirs and creditors of

Bunting, but would be an example against which a court of equity would revolt."

Whether or not Bunting had any private creditors does not appear in this case. There is no claim that such creditors exist set up in the answer, nor does the evidence show their existence. Bunting was the sole owner of the corporation, and, so far as the record shows, conducted his business through his bank. However it may be, as to the existence of such creditors, in point of fact, it is difficult to see how the corporate creditors, whose funds purchased the insurance, can share ratably with the private creditors of Bunting in the proceeds under this decision. Bunting, though the sole owner of the stock, was still but a shareholder in the institution which, it is admitted, was a valid corporation, and its articles of incorporation provide, agreeably to the statute then in force, that "the private property of the stockholders shall not be liable for the debts or liabilities of the corporation." How then can the creditors of the corporation share in his private estate? Whether he had any private property is not shown by the record, except as to the $35,000 of other insurance, which, it seems, has already gone to the heirs. That there are many corporate creditors is apparent from the fact that, when the institution closed its doors, it was short over $150,000. Is it then revolting to a court of equity to return to those creditors, whose money made it possible to procure the proceeds of insurance, about one third of their trust funds which had been misappropriated and wasted? Is it not inequitable and unjust to take property from the creditors whose money purchased it, and give it to others who contributed not one dollar to the purchase? In my judgment this opens the door to fraud, and sets aside the well-established principles that a trustee can not secure a profit or advantage to himself in the

management of the affairs of his *cestui que trust.* It seems that hereafter the way is open for a trustee to obtain insurance for himself or family, or even other property, with trust funds by simply manipulating the purchase with a note instead of cash, and thus profit by his own wrong. That Bunting all the while thoroughly understood the insolvent condition of his bank, and his lack of funds and credit there, upon which to draw to meet his personal obligations, is manifest from the evidence, yet he may not have had it in his mind to perpetrate an absolute fraud upon his creditors. He may have intended the insurance for the benefit of his creditors. This seems to be indicated by the evidence of the witness Vogeler, who testified that the insured said that the people might criticise him for taking out so large a life insurance policy, but that " he believed he owed it to his creditors to do it." Again, it may be that foreseeing the inevitable, and, actuated by the desire to save something for the future maintenance of his family out of the impending wreck, he lost sight of the effect which his action would have upon the rights of his creditors. However this may be, he violated his duty as trustee and his action was fraudulent as to his *cestui que trust.*

While it is a laudable purpose in any man, during his lifetime to make provision for his family after his death, yet a court of equity ought not to permit him to make such provision in disregard of his duty to, and at the expense of, those to whom he stands in the relation of a trustee.

In this case, however, if the proceeds in controversy were turned over to the creditors, the family of the deceased, considering his financial ability in his lifetime, would remain provided for with much liberality, for, aside from the $50,000 in question herein, the record shows other policies of the insured aggregating $35,000,

in which it appears the children and the family of the deceased are the beneficiaries. That the proceeds in dispute should be distributed among the creditors of the insolvent corporation is thus not only in accord with legal principles, but also with justice and fair dealing.

"A trustee," says Judge Story, "will not be permitted to obtain any profit or advantage to himself in managing the concerns of the *cestui que trust*. In short, it may be laid down as a general rule, that a trustee is bound not to do anything which can place him in a position inconsistent with the interests of the trust, or which have a tendency to interfere with his duty in discharging it. And this doctrine applies, not only to trustees strictly so called, but to other persons standing in like situation."

Since, however, the defendant holds the proceeds merely as a trustee, pending the litigation to determine to whom they belong, and, in the absence of evidence showing that during such time he made use of the money, or received any interest or profit because thereof, I am of the opinion that the decree of the lower court is erroneous in so far as it adjudges the payment of interest on the proceeds by the defendant pending the litigation. In all other respects that decree, in my judgment, ought to be affirmed.

I have thus expressed my views at considerable length, owing to the importance of the principles involved.

For the foregoing reasons I dissent.

BARTCH, C. J., dissenting from the order of the majority of the court overruling the petition for a rehearing:

I think the petition for a rehearing ought to be granted. An examination of the opinions filed in this case, shows that whether the payment of the $305 was actually made by Bunting, in addition to the giving of the note of $1,500 for the first premium, was regarded as a material question

of fact.    In the opinion of Mr. Justice Miner, which is the authoritative opinion herein, it is assumed, as appears, that the $305 were actually paid by the insured.    It is now shown by the affidavit of Mr. Fritter, filed in support of the petition, the affiant being the agent through whom the insurance was purchased, that the $305 were never paid at all, a fact which to my mind seemed clear from the evidence in the case.    Among other things, there is a statement in the affidavit, as follows:  " Affiant further says that for the purpose of inducing the said Bunting to take out a policy of insurance with the said company to the amount of fifty thousand dollars, affiant agreed with the said Bunting that he would accept as full payment of the first premium said Bunting's note for the sum of fifteen hundred dollars ($1,500), on condition that the said Bunting would arrange with the Pocatello bank to have the said note cashed, which the said Bunting did, and the said note was cashed at the said bank.    That said Bunting paid no more as the first premium than the said note, and the same was accepted by this affiant in full payment of the first premium.    This arrangement was a private arrangement between this affiant and the said Bunting, with which the said insurance company had nothing to do, and the deduction from the regular premium, which was eighteen hundred and five dollars ($1,805), said deduction amounting to three. hundred and five dollars ($ 305) came out of this affiant's commission as agent; the full amount of the proceeds of said premium required by said insurance company, less commission, as received by the said insurance company in satisfaction of the first premium, and a receipt issued by said company therefor in form.''

There is now no longer any room for doubt that the note was the only consideration for the first premium, and that it was ultimately paid out of the assets of the

insolvent bank. The affiant all the time during this controversy was a non-resident, and was not a witness at the trial.

Considering the circumstances surrounding this case, the large amount involved, the important legal and equitable principles which have been invoked concerning the application of which all the members of the court so widely differ, the effect which this decision will have upon rights of property and upon trust relations and the use of trust funds, and its grave importance respecting the rights of *cestui que trust* in this State in the future, it seems to me that this is eminently a case which ought to be re-examined, and that if the findings of the trial court are to be set aside, the case ought to be sent back for a new trial.

For these reasons I dissent from the order overruling the petition.